## SYKES v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

### Division One, December 23, 1903.

1. **Negligence: CONNECTING CARRIER: MUTUAL INTEREST AND PROFIT.** In a suit against a railroad company by an employee of a wheel-repairing company for personal injuries sustained by him in falling through a hole in the floor of the car from which he was removing freight for the repair company, an instruction based on the theory that the railroad company and repair company "were engaged in a matter of mutual interest and profit" should not be given, if the evidence shows that the car was delivered to the repair company, not by the defendant railroad, but by a connecting carrier, which is not shown by the evidence to have been the agent of the defendant railroad in making the delivery of the car. (Distinguishing Roddy v. Railroad, 104 Mo. 234.)

2. ————: INSTRUCTION: PRESUMPTION: NEGLIGENCE MUST BE PROVED. The instructions should not tell the jury that if the employee, who was neither passenger nor servant of defendant, did not know that the car, from which he was removing freight, was not in a safe condition, he had a right to presume that the defendant railroad had done its duty and that the car was in such a condition as would enable him to do his work with reasonable safety. There can be no presumption of negligence as the basis of an action in such case. The negligence must be charged to be the negligence of defendant, and must be proved as charged.

3. ————: LIABILITY TO SERVANTS OF CONSIGNEE: THROUGH SHIPMENTS. When a railroad receives freight to be delivered to a consignee whose servants are to unload the car, it is charged with the duty to exercise ordinary care to see that the car is in such a state of repair that such servants, while exercising ordinary care themselves, can enter upon it with reasonable safety. And if the car is loaded for a through shipment, and must pass over a connecting road to reach the consignee, it is the duty of the ultimate carrier to examine it and ascertain whether or not it is in such a reasonably safe condition, and if it is not, to make the necessary repairs or notify the consignee of its unsafe condition. And a failure to perform this duty in either case is negligence.

4. ————: ————: ————: INTERMEDIATE CARRIER. But no such duty is imposed on an intermediate carrier, which neither receives the car nor delivers it on the switches of the consignee. It is not the duty of an intermediate carrier to examine a car and ascertain whether or not it is in a safe condition for the servants of the consignee to enter upon it for the purpose of unloading it. Nor is it its duty if it finds it in an unsafe condition, to repair it, or to set it out, or to change the load to a safe car, nor can it refuse to receive a car from a connecting line for any such reason.

5. ————: ————: OWNERSHIP OF CAR. The liability of the carrier in any such case is the same whether it owned the car or not.

Transferred from St. Louis Court of Appeals.

CIRCUIT COURT JUDGMENT REVERSED.

*L. F. Parker* and *J. T. Woodruff* for appellant.

(1) The principal question involved in this case is, whether a railroad company owning a car which, while temporarily absent from its line is, without its knowledge or consent, loaded with freight destined to

a distant point and is in the course of transportation carried a part of the intermediate distance, but neither the initial nor terminal part, by the line of the company owning the car, but under no traffic arrangement, and for which an arbitrary charge is made, is liable for an injury suffered while unloading such car by an employee of the consignee, who is entirely disconnected with either line, by reason of a defect in the floor thereof. Defendant contends there is no such liability, for the reason that a railroad company in such circumstances is under no duty to see to it that one of its cars is in fit condition to be unloaded by an employee of the consignee, and hence there is no right of action. If any duty exists, it must arise out of some contract violated, some duty non-performed, or some duty imposed by law in addition to or dependent of, any contract duty. It has been the law in this State since 1862, and it has been the law in England and the Federal courts of this country for a longer period, that a third person can not maintain an action for injuries resulting to him from the breach of the terms of a contract by either of the parties thereto. Gardner v. Armstrong, 31 Mo. 535; Kinealy v. Railroad, 69 Mo. 666; Munn v. Railroad, 86 Mo. 347; Gordon v. Livingston, 12 Mo. App. 267; Lampart v. Gas Light Co., 14 Mo. App. 376; Roddy v. Railroad, 104 Mo. 245; Heizer v. Threshing Machine Co., 110 Mo. 605; Winterbottom v. Wright, 10 Mees. and Wellsby 109; Curtin v. Somerset, 21 Atl. 244; 140 Pa. St. 70; Bank v. Ward, 100 U. S. 195; Sawyer v. Railroad, 35 N. W. 671; 38 Minn. 103; Shearman & Redfield, Negligence (5 Ed.), sections 8 and 116. (2) It can not be said that any contractual relation existed between plaintiff and defendant, which in any manner tended to establish the relation of master and servant, for all of the evidence is that plaintiff was in the exclusive employment of the car wheel company, who directed his work and paid him for it. Indeed, he testifies himself that he never did anything for the defendant, and knew none of the Frisco

officials or employees. It is plain that the defendant owed no duty to plaintiff as a servant, because no such relation existed. Speed v. Railroad, 71 Mo. 308; Roddy v. Railroad, 104 Mo. 246; Wood, Master and Servant, sec. 281; 1 Shearman & Redfield, Negligence (5 Ed.), sec. 160.

*Thos. B. Harvey* for respondent.

Appellant contends for only one proposition, to-wit, that it was neither the initial nor the final carrier, but an intermediate carrier, and, therefore, not liable. Even if the premises were true, we do not admit the correctness of the conclusion. But, as a matter of fact, defendant railroad company, in its relation to the car wheel company and its employees, was the initial, the final and the only carrier. It was not a connecting carrier, because the evidence, the very waybill of the Fort Scott & Memphis railroad, shows that it billed said car only to Nichols Junction, the connecting point with the defendant railroad, and that said Fort Scott & Memphis railroad not only did not make charges from Kansas City through to St. Louis, but not even any from Kansas City to Nichols Junction. And the waybill of the defendant railroad shows that it made and collected from the consignee, the car wheel company, charges from Nichols Junction to the premises of the car wheel company, to-wit, $26.13, which included $2 which it, and not the consignee, paid the Missouri Pacific for switching privileges. The Missouri Pacific railroad performed no service for the car wheel company, and was under no obligation to said company or its employees with reference to the condition of said car. The Missouri Pacific was, in delivering said car on the premises of the car wheel company, the agent and servant of its employer, the St. Louis & San Francisco Railway Company, defendant herein. Upon the proposition that a carrier who does not receive from the preceding carrier, under and

by virtue of the original contract for through transportation, is not a connecting carrier, and that under the circumstances of this case, defendant railroad company was both the initial and final carrier, we refer the court to the following authorities:   McCann v. Eddy, 133 Mo. 59; Nimes v. Railroad, 107 Mo. 475; Nanson v. Jacob, 12 Mo. App. 125.   There seems to be something absurd in the proposition that a railroad can start out from its possession one of its own cars in an unfit and unsafe condition for the purposes for which it is to be naturally used, and receive said identical car back into its possession a few days afterwards, and then claim that, because said car in the meanwhile has been upon some other road in making the round trip, therefore, the other road becomes the initial carrier.   The evidence in this case shows that the floor of said car was rotten and full of holes for weeks before this accident; and that it passed through the hands of the inspector of defendant railroad about the 18th of the month at Nichols Junction, as it was about to leave said road; and, again, ten days afterwards when it returned to said railroad, its owner, and was then delivered to plaintiff's employer, to be unloaded so that its possession and use might be resumed by said owner, and said employer of the plaintiff being required to pay the aforesaid amount of $26.13 to defendant railroad company for transportation of said car and freight from Nichols Junction to the point on the premises of the car wheel company, where plaintiff was injured while engaged in unloading said car. Appellant makes a most desperate effort by a critical and strained interpretation of many authorities, to avoid what seems to me to be a very plain proposition, and one well supported by the great weight of authority, as well as by common sense, to-wit, that a railroad company which bills and delivers to a consignee in consideration for certain charges to be paid by consignee, a carload of freight, to be unloaded by said consignee's employeees, owes a duty to said employees to deliver a car in fit

and safe condition for them to go upon for the aforesaid purpose. Appellant admits that the initial or final carrier would owe a duty to, and be liable to, the consignee himself, but not the consignee's servant, who does for the consignee the work of unloading, which it was known would have to be done and which was invited to be done. Under this reasoning there could never be any liability under the circumstances of such a case as this, it matters not how rotten and dangerous might be the cars or other instrumentalities delivered to the corporation. In support of the proposition that where the instrument furnished is to be used in a joint undertaking or in a matter beneficial to both parties, a duty is owed to each individual of a class which may naturally be expected to handle said instrument under the terms of the undertaking between the two parties, I respectfully call the attention of the court to the following authorities: Elliott v. Hall, 15 Q. B. D. 315; Heaven v. Pender, 11 Q. B. D. 503; Indermaur v. Dames, L. R. 1 C. P. 274; 2 C. P. 311; Railroad v. Snyder, 55 Oh. St. 342; Moon v. Railroad, 46 Minn. 106; Railroad v. Booth, 98 Ga. 20; Horne v. Mechin, 115 Mass. 326; Glenn v. Winters, 40 N. Y. Supp. 659; Lee v. Railroad, 1 Am. Neg. Rep. 208; Spaulding v. Granite Co., 34 N. E. 1134; Olson v. Fuel Co. 77 Minn. 528; Hoosier Stone Co. v. Railroad, 131 Ind. 575.

MARSHALL, J.—This is an action for personal injuries. The plaintiff recovered fifteen hundred dollars damages in the circuit court. The defendant appealed to the St. Louis Court of Appeals, and that court reversed the judgment and ordered the case remanded to the circuit court for a retrial. One of the judges of that court concurred in reversing the judgment, but not in remanding the case, and deemed the order remanding the case to be in conflict with the decision of this court in Roddy v. Railroad, 104 Mo. 234, and for this reason that court certified the case to this court, under the sixth

amendment to article six of the Constitution, and the case is therefore here for determination, as in case of jurisdiction obtained by ordinary appellate process.

The suit was originally against both the defendant railroad and the St. Louis Car Wheel Company. The trial court nonsuited the plaintiff as to the St. Louis Car Wheel Company, and the plaintiff recovered a judgment in that court against the railroad company.

The case made is this:

The plaintiff was a common laborer in the employ of the St. Louis Car Wheel Company. That company was engaged in the business of making and repairing car wheels. Its place of business was located between the tracks of the Wabash and Missouri Pacific railroads, and each of said roads had switch tracks running into and upon the property and place of business of the car wheel company, over which cars were run carrying new wheels from or old wheels into the place of business of the car wheel company. The defendant had no tracks running to the premises of the car wheel company. It was a part of the plaintiff's business to unload the old wheels so brought to the premises of the car wheel company, and he had been so engaged for about three years before the date of the accident complained of.

On January 17, 1898, defendant's coal car numbered 5149, loaded with coal, was delivered by defendant at Nichols Junction, to the Kansas City, Fort Scott & Memphis Railroad Company, and consigned to a consignee at Kansas City. It was inspected by defendant's inspector at that time and found to be in good condition. After delivery of the coal to the consignee at Kansas City, the Kansas City, Fort Scott & Memphis Railroad Company loaded the car, at Kansas City, with old car wheels that were consigned by one Jarvis at Kansas City to the St. Louis Car Wheel Company at St. Louis. The car was properly inspected by the Kansas City, Fort Scott & Memphis Railroad Company, at the time of so loading it, and it was then found to be in good con-

dition. The Kansas City, Fort Scott & Memphis Railroad Company billed the car to Nichols Junction, and carried it to that place, where it was delivered to the common agent of that company and of the defendant, and that agent, acting for the defendant, billed the car to the car wheel company at St. Louis. The car was inspected by the defendant's inspector at Nichols Junction and found to be in good condition. The car was hauled by the defendant from Nichols Junction to the eastern terminus of the defendant's road (at that time) at Chouteau avenue, in St. Louis, and there delivered to the Missouri Pacific railroad, and by it hauled over its tracks to the premises of the St. Louis Car Wheel Company, and was delivered to that company on January 29th. It remained there until the morning of January 31st, when the foreman of the car wheel company ordered the plaintiff and other workmen to unload the car, which they proceeded to do, and in the doing of it and while moving one of the wheels the plaintiff stepped into a hole in the floor of the car, his right foot and leg went down through the hole, he was thrown down, the car wheel rolled back onto his leg and broke it. The hole was eight or nine inches long and four or five inches wide. The plaintiff's testimony and that of his witnesses is to the effect that the hole appeared to be an old break; that there were other holes in the floor of the car which had been covered over with planks; that the floor of the car was rotten; that there was trash and straw and ice on the floor of the car which hid the condition of the floor, and one witness said that the hole into which the plaintiff stepped appeared to have been covered with a piece of bark and with trash and straw.

The plaintiff testified that he had unloaded many cars before. That it was a very common occurrence for cars to come there with holes in their floors, and that some of them would have planks laid over the holes; that he saw cars there with holes in their floors every day; that the cars of the Burlington road were the worst,

and that it was a common occurrence for the cars of that road to have holes in the floor; that it was not so common for the cars of the other roads to have such holes, but that he saw holes in other cars often. He further testified that when the men started to unload this car, they had to shove the trash away so that the door of the car would rest flat on the floor of the car; that he never examined this car before commencing work to see whether there were any holes in the floor, and never paid any attention to that matter; that he did not see anything wrong with the floor and did not look for anything; that there was nothing to prevent his seeing whether there was anything wrong with the car, as he had good eyes, but that he did not apprehend any danger and did not examine the floor of the car at all before he was hurt.

It appeared that the defendant charged and collected from the car wheel company the sum of $33.95 for hauling the car from Nichols Junction to St. Louis. It also appeared that when the defendant delivered cars that were consigned to the car wheel company, to the Missouri Pacific Railroad Company, the defendant ceased to have any control over them or to have anything further to do with them. It also appeared that the Missouri Pacific railroad charged two dollars per car for hauling the car from the terminus of the defendant's road to the premises of the car wheel company, and the plaintiff contends that the defendant included that charge in its bill and collected it from the car wheel company, and paid it to the Missouri Pacific Railroad Company, and that in rendering the service the Missouri Pacific Railroad Company only acted as the agent for the defendant. On the other hand, the defendant claims that the Missouri Pacific railroad was an independent connecting carrier, and that when the defendant turned over the cars to the Missouri Pacific railroad, the power, authority and control of the defendant over the car ceased, and therefore its liability with respect to the car ceased, and that the Missouri Pacific Railroad Company

became the connecting carrier to transport the car to its destination, and that this is true without regard to how many miles that company had to haul the car.. There is no substantial evidence to support the plaintiff's contention that the defendant collected the charges of the Missouri Pacific railroad for switching or hauling the car, nor that that road was merely acting as an agent of the defendant in hauling the car from the terminus of the defendant's road to the premises of the car wheel company. So far as the record here discloses, the defendant was an intermediate connecting carrier in this case..

At the close of the whole case defendant demurred to the evidence, the court overruled the demurrer, and the defendant excepted.

As before stated the car wheel company also demurred to the evidence, and the court sustained the demurrer as to that company.

.The defendant stood upon its demurrer to the evidence, and asked no other instructions.

At the request of the plaintiff the court gave six instructions, but as the fifth related to the measure of damages, and the sixth related to the burden of proof,. and as no point is made here as to those instructions,. they need not be reproduced. The other four instructions given for the plaintiff are as follows:

"1. The court instructs the jury that if you believe and find from the evidence in the case that at the time of the injury complained of by plaintiff he was engaged at work in the employment of defendant St. Louis. Car Wheel Company, in unloading car wheels from a car which had been run in and upon the premises of said car wheel company by the defendant, St. Louis & San Francisco Railroad Company, to be by it, the said car wheel company, unloaded, the said railroad company being engaged in and paid for the hauling of freight to and from said premises for said car wheel company upon cars furnished by said railroad company, and then and there to be unloaded upon said premises of said car

wheel company, said transportation of freight and unloading of the same as aforesaid being for the mutual benefit of the said railroad company and said car wheel company; and that the plaintiff, at the instance and command of his employer, the said car wheel company, was at the time of the alleged injury engaged in unloading a car, as aforesaid, furnished by the defendant, the railroad company; and that in the penformance of said duty by the plaintiff or other it became and was necessary to stand and move about on the floor of said car; and that said car was then and there in an unsafe condition by reason of the floor having holes and pitfalls therein, and that the defendants knew of the condition of said floor, or by the exercise of a reasonable degree of care and diligence could have known of its condition; and that plaintiff did not know of the condition of said floor until the happening of the injury complained of, and that the defect and holes aforesaid were not patent to him, such as would have been disclosed to him had he been ordinarily observant; and that while plaintiff was so engaged as aforesaid in the service of said car wheel company, unloading from a car furnished aforesaid then and there loaded with car wheels consigned to said car wheel company, he was hurt, injured and damaged by the floor of said car being out of repair, and with holes and pitfalls therein as aforesaid, and that the injury occurred without the fault or negligence of plaintiff contributing thereto, then your finding should be for the plaintiff.

"2. The court instructs the jury that if you believe and find from all the evidence in the case, that the defendant, the railroad company, was engaged in transporting over its railroad to and on the premises of the defendant, the car wheel company, for a valuable consideration, cars to be unloaded by said car wheel company on its premises aforesaid, then it became and was the duty of the railroad company to furnish cars in such a state of repair that the said car wheel company and its

employees could, with reasonable care and prudence, safely go upon and work upon them in order to do the necessary things for the unloading of the cars. And if you should find that the plaintiff, before the time of the alleged injury, did not know that the car furnished as aforesaid by the railroad company was not in a safe condition and repair, he had a right to presume that the defendant railroad company had done its duty, and that said car was in such a state of repair and condition as would enable him to do his work with reasonable safety, and he had a right to rely and act upon such presumption.

"3.    The court further instructs the jury that if you believe and find from the evidence in the case that the plaintiff did not know of the alleged condition of the floor of said car until after the happening to him of the injury referred to in the testimony, and that the condition would have been observed by him by the exercise of ordinary care and reasonable prudence on his part, it was not incumbent upon plaintiff to search and examine for defects in the floor of said car not so observable; but that he had a right to assume that said car was in suitable and safe condition for the doing of the necessary labor on the same necessary to the unloading thereof.

"4.    If the jury believe and find that the defendant railroad company kept inspectors at Nichols Junction or other points on its railroad line, intermediate between the points from which they may find the alleged car was received loaded for transportation to the defendant car wheel company at the city of St. Louis, and that said inspectors were charged by the railroad company with the special duty of examining into the condition of cars at those points and seeing that they were in a safe and proper condition before they were suffered to depart therefrom, then the defendant railroad company is liable to plaintiff for any neglect of duty on the part of such inspectors and repairers whereby plaintiff was in-

jured, if the jury believe that said inspectors were negli-
gent. If the jury believe that he was so injured in con-
sequence of such neglect of duty; then said railroad
company would be likewise liable if such injury resulted
because of the careless and negligent performance of
said duty by said car inspectors.''

There was a verdict and judgment for the plaintiff
for fifteen hundred dollars. The defendant appealed to
the St. Louis Court of Appeals, where, as above stated,
the judgment was reversed and the cause ordered re-
manded, and then the case was certified to this court
for the reasons stated.

I.

*Instructions.*

It is apparent that the instructions given at the
plaintiff's request were modeled after the instructions
given for the plaintiff in the case of Roddy v. Railroad,
104 Mo. 234, and it is equally clear that this case was
tried by the plaintiff and the trial court upon the theory
that that case affords an exact precedent and parallel
for this case.

An analysis of that case and a comparison of it with
the facts in this case will easily demonstrate that the
principles underlying the two are not all the same, and
that while much that is said in that case applies equally
to this case, the two cases in their final essentials are not
at all alike, and the ground upon which the plaintiff's
cause of action was rested in that case is not present at
all in this case, but that the crucial question in this case
was not involved or decided in that case. The Roddy
case was this:

One Pickle owned a rock quarry about three miles
from Warrensburg, a city located on the line of the rail-
road. The railroad built a branch road from the main
line to a point near the quarry, for the purpose of af-

fording easy shipping facilities for Pickle's rock. From the branch road Pickle built a switch track or road to his quarry for the purpose of running and standing cars upon it while being loaded. The railroad, when requested by Pickle, delivered the cars on its branch road at the switch, and Pickle's employees moved the empty cars from the branch road on to Pickle's switch track and loaded them, and then the railroad engines hauled the loaded cars away to their destination. The plaintiff, Roddy, was an employee of Pickle, and while attempting to move a car so furnished by the railroad, from the branch road to the switch track, was injured in consequence of a defective brake on one of the cars. Roddy sued the railroad and obtained a judgment for six thousand dollars. The railroad appealed to this court. The opinion in that case was written by the learned and lamented MACFARLANE, J., and is in his usual clear, comprehensive and careful style.

It was held in that case: First, that no contractual relation existed between Roddy and the railroad, and that the railroad owed Roddy no contractual duty, and, therefore, there could be no recovery based upon a breach of contract. Second, that the relation of master and servant did not exist between the railroad and Roddy, and, therefore, there could be no recovery growing out of any breach of duty arising from the relationship of master and servant. Third, that there is a class of cases not arising out of any contractual relation or out of any other relationship between the parties, where recoveries are allowed; such as, where the manufacturer of an imminently dangerous drug or device or instrument or poison fails to label it with a notice of its dangerous character and a third party is injured while using it. But it was held that a railroad car, even though supplied with defective brakes, was not an imminently dangerous instrument, and, therefore, there could be no recovery on that ground. Fourth, that the railroad company and Pickle were engaged in "a matter-

of mutual interest and profit;" that the railroad knew when it furnished cars to Pickle, that Pickle's servants would have to use them in discharging Pickle's part of the mutual business, and, therefore, "the obligation rested upon defendant to use ordinary care to provide such [cars] as would be reasonably safe for such use."

It was then held that Roddy was not conclusively shown to have been guilty of such contributory negligence as cut off a recovery by him. But the judgment was reversed because the instructions given for the plaintiff were erroneous, in telling the jury that the plaintiff had a right to assume that the railroad would do its duty and furnish cars that were in a good and safe condition. Speaking of the instruction given in that case, and declared to be erroneous, the learned judge said:

"VI. The instruction, in directing the jury that plaintiff had the right to assume that defendant would furnish Pickle with cars properly supplied with brakes, in good repair and condition, properly declared the law as applied to the duty a master owes to his servant. But if the servant was informed by the master, or had learned by observation, or from any other source, that some of the instrumentalities furnished him were defective and dangerous, and without promise that they would be repaired, he continued in the master's service, then the risk of injury from such defective instrumentalities would become an incident to such service, which he would assume. [Price v. Railroad, 77 Mo. 508; Porter v. Railroad, 71 Mo. 66; Devitt v. Railroad, 50 Mo. 302; Thorpe v. Railroad, 89 Mo. 650.]

"While the relation of master and servant did not exist between these parties, defendant owed to plaintiff the observance of reasonable care in the selection of its cars for his use, which is the same degree of care the master is required to observe in providing his servants with the instrumentalities for carrying on his business.

No reason can be seen why, if plaintiff knew that defective and dangerous cars were frequently left for his use, he would not assume the risk of injuries from such defects as could have been ascertained by reasonable inspection on his part. While defendant may have been negligent in the discharge of the duties it owed to plaintiff, if plaintiff neglected such precautions as common prudence demanded under all the circumstances, he was guilty of contributory negligence, which should have defeated a recovery.

"In view of the fact that plaintiff himself testified that one-half the cars were without brakes, it was not proper to instruct the jury that he had a right to rely on defendant's performance of its duty in furnishing such as were properly supplied with brakes. The knowledge plaintiff had of the common neglect of defendant, imposed upon him, for his own protection and safety, the duty of reasonable care in ascertaining for himself the condition of the cars before he attempted to handle them, and a failure to do so would constitute contributory negligence on his part. Whether such care was used on the occasion of his injury should have been submitted to the jury.

"For the errors mentioned, the judgment is reversed and cause remanded."

The first instruction given for the plaintiff in this case is erroneous. That instruction is bottomed upon the assumption that this case is like the Roddy case, in that, the railroad and the car wheel company were engaged in "a matter of mutual interest and profit;" and upon the further premise that the defendant here delivered this car to the car wheel company, on its premises. This is in conformity to the plaintiff's theory that the Missouri Pacific Railroad Company only acted as the agent of the defendant in delivering the car to the car wheel company, but as hereinbefore pointed out, the evidence does not furnish any substantial support for this position. On the contrary, this record shows that the

defendant in this case was an intermediate connecting carrier, and its liability must be determined as of that character, and not, as in the Roddy case, on the basis of two persons engaged in "a matter of mutual interest and profit."

The first instruction, therefore, put the whole case to the jury upon an unauthorized basis, and hence that instruction is erroneous.

The second instruction told the jury that if the plaintiff did not know that the car was not in a safe condition, he had a right to presume that the railroad had done its duty and that the car was in such a state of repair and condition as would enable him to do his work with reasonable safety, and he had a right to rely and act upon such presumption.

The instruction is an almost exact copy in this respect of the second instruction that was given for the plaintiff in the Roddy case, and this court declared that instruction to be erroneous and reversed the judgment for that error.

This is an action arising *ex delicto*. The basis of the plaintiff's claim is that the defendant has been guilty of a particular act of negligence, which was the direct and proximate cause of the injury to the plaintiff, and that the plaintiff was guilty of no contributory negligence. The burden of proof is upon the plaintiff to show the negligence of the defendant and that such negligence was the direct and proximate cause of the injury.

Every person is presumed to perform his duty, but such presumption can never supply the want of proof of negligence on the part of a defendant in an action against him *ex delicto*. That presumption is indulged by the law in favor of the defendant and not as a basis for a judgment against him. Such presumption is a part of the genius of the common law, that every man is presumed innocent until reasonably shown to be guilty. It is the underlying principle in civil cases as

well as in criminal cases.   It is axiomatic in the law that he·who charges negligence or wrong-doing upon another and seeks damages resulting therefrom, must prove the negligence or wrongdoing and must connect the injury therewith.   He must adduce proof and has no right to indulge in presumptions.   The same rule that presumes a defendant innocent of negligence until the contrary is shown, likewise presumes the plaintiff innocent of contributory negligence until the contrary is shown.

The second instruction given for the plaintiff was erroneous.

The third instruction given for the plaintiff while not quite so glaringly erroneous as the second, nevertheless contained the same erroneous elements as to such presumptions, and was therefore also erroneous.

## II.

The liability of carriers to third persons, other than passengers or employees, for injuries resulting from defective appliances.

Cases like the one at bar are of comparatively recent origin, and, as is to be expected under such circumstances, the law has not been similarly declared in all jurisdictions.

Until recent years railroads were operated independently of each other.   Each had its own tracks, depots, rolling stock and appliances.   Each carried the freight offered to it, as far as its line extended, and discharged it at its terminus, in its own depot, by means of its own employees.   Consignees got the freight from the depot and not from the car.   Under such a mode of doing business it is apparent that no third person, other than an employee, could be injured in consequence of any defective appliance used by the railroad, and the railroad company, therefore, was not obliged to have any regard to any injury that might result to any third person while

loading or unloading a car, for such person had nothing to do with either.

The demands of commerce then required that the bulk of the freight should not be broken in transit, and the railroads were forced to arrange for through shipments, without breaking bulk, from the point of shipment to the point of ultimate destination. This compelled the railroads to connect their lines, so that the same car, into which the freight was loaded at the initial point of shipment, should carry it to its ultimate destination. This necessitated the issuing of through bills of lading, and of collecting, generally from the consignee, the whole freight, by the ultimate carrier, and the distribution by it to each road that hauled the freight of its proportionate share of the freight charges. The statutes of this State have practically made such through shipments obligatory, for section 1139, Revised Statutes 1899, makes it unlawful for common carriers to enter into any combination, contract or agreement, by change of schedule, breakage of bulk, etc., to prevent "the carriage of freight from being continuous from the place of shipment to the place of destination within this State," etc.

Formerly all freight was delivered by the shipper to the carrier at its depot, and was loaded on the car by the carrier's servants.

Now the statutes of this State, sections 1113 and 1119, Revised Statutes 1899, permit switches to be constructed to grain elevators or warehouses, coal, lead, iron, zinc or any other ore, mines, sawmills and any other industry, by the owners thereof, and compel the railroads to permit such switches to be connected with the railroad tracks. And section 1114 requires all consignments of grain to be delivered at such elevators or warehouses, unless the destination is changed by the consignee or consignor; and sections 1119 and 1120, require the railroads to furnish the switch-stand, frog and other necessary materials for making connection be-

tween such switches to mines and the tracks of the railroad, and to operate such switch tracks, and upon demand to furnish sufficient cars to such mineowners at such mine for the transaction of the business, and in the event the railroad fails so to do, permits such mineowners to furnish cars, and requires the railroad to switch and haul such cars without discrimination between cars owned by the railroad or by any other person.

In this state of the law it can not now be fairly said that when a railroad furnishes cars to a shipper to be loaded by the shipper's servants, and to be hauled by the railroad, or when the railroad delivers loaded cars to a consignee upon the consignee's switch, to be unloaded by the consignee's servants, the railroad and the shipper or consignee were engaged in "a matter of mutual interest and profit," and for this reason the railroad is liable to the servants of the shipper or consignee for injuries received in consequence of defective appliances. For under the law in this State the railroad is bound to permit the construction of switches from its tracks to large business establishments, and is bound to operate such switches, and to deliver carload shipments in bulk to, and receive carload shipments in bulk from, such establishments.

The liability of a railroad to the servants of shippers or consignees for injuries received by reason of defective appliances does not, therefore, rest upon the convention, agreement or contract of the parties, nor upon the mutual interest or profit of the parties, but such liability is gauged and regulated by the general principles of law applicable to negligence. In other words, a railroad is liable to any one for injuries that are inflicted by its negligence. It owes a duty to mankind to so conduct its own business as not to be guilty of negligence that results in injury to third persons who are themselves without fault, and who are injured while in the pursuit of their lawful business. This is the basis, the reason and

the extent of its liability.   Under this rule when a railroad loads cars with freight to be delivered to a consignee whose servants are to unload the car, it is charged with the duty to exercise ordinary care to see that the car is in such a state of repair that such servants, while exercising ordinary care themselves, can enter upon it with reasonable safety for the purpose of unloading it.   So, when a railroad furnishes a car to be loaded by the servants of the shipper it is charged with the duty to exercise ordinary care to see that the car is in such a state of repair that such servants, while exercising ordinary care themselves, can enter upon it with reasonable safety for the purpose of loading it.

And when a car is loaded for a through shipment, and must pass over one or more connecting roads before it finally comes into the possession of the ultimate carrier for.delivery to the consignee, it is the duty of the ultimate carrier before delivering it to examine it and ascertain whether it is in such a state of repair that the servants of the consignee, while exercising reasonable care themselves, can enter upon it with reasonable safety for the purpose of unloading it, and if it is not in such a condition, it is the duty of the railroad to make the necessary repairs, or to notify the consignee of the unsafe condition of the car, so that the consignee can warn his servants before they enter upon it.

Therefore, in the case just instanced, the initial carrier is liable because it was negligent in selecting an unsafe and improper car upon which to load the freight, and the ultimate carrier is liable because it was negligent in delivering an unsafe car to the consignee, knowing that the servants of the consignee would enter upon it to unload it.   Of course, the initial carrier would not be liable for defects that occurred after the car was selected and after it left its possession, if the car was.reasonably safe when it was loaded and when it passed beyond its control.

This leaves for consideration the liability of an in-

termediate carrier, who did not select the car, and who is obliged under the law to receive it and haul it as far as its road runs and there deliver it to another intermediate carrier or to the ultimate carrier, and this, too, without regard to whether the car belonged to such intermediate carrier or to some other road or person, for in all such cases the ownership of the car is immaterial, and the carrier's liability is governed by the same rules whether it owned the defective car or not.

It is manifest that an intermediate carrier has no power of selection and, therefore, can not be guilty of negligence in loading the freight upon an unsafe or defective car. An intermediate carrier is not charged with notice that any particular car is to be delivered at the premises or upon the switch of the consignee or that the consignee's servants will unload it. So far as the intermediate carrier is concerned, it might be that the cars would be unloaded by the servants of the ultimate carrier at its depot. No person except the servants of the intermediate carrier would have any lawful right to enter upon the car while it was in its possession. Therefore, it is no part of the duty of an intermediate carrier to examine a car to see whether it is in a safe condition for any one to enter upon it for the purpose of unloading it when it reaches its destination, nor if it discovers that it is not in such a safe condition, to repair it, or to set it out, or to change the load to another and a safe car, nor can an intermediate carrier refuse to receive a car from a connecting line for any such reason.

The duty and the right of an intermediate carrier is to examine the car to see whether it is in a reasonably safe condition to be hauled by it to its terminus and there to be in such a condition that its connecting intermediate or ultimate carrier would be bound to receive it for transportation from such intermediate carrier. This is the extent of the liability and duty of an intermediate carrier. The defendant in this case is an intermediate carrier. No negligence of the intermediate carrier

is shown, or in the nature of this case can be shown, and, therefore, the plaintiff made out no case whatever against the defendant, and the demurrer to the evidence should have been sustained, and hence, the judgment is without foundation in law, and must be reversed.

This is a case of first impression in this court, but the industry and.research of counsel have furnished the court with many cases, both English and American, which it is claimed on the one side and denied on the other, are decisive of this case. A review or analysis of those cases is not deemed necessary or profitable, for they can not be reconciled, and are made to depend upon so many different theories that it would serve no good purpose to discuss them. It is, therefore, deemed best to leave the study of those cases to the inquisitive or philosophical mind, and to formulate in as simple and brief a manner as possible, the rules applicable to the liability of initial, intermediate and ultimate carriers to third persons, other than passengers or its employees, for injuries resulting from defective appliances, that will be enforced hereafter in this jurisdiction.

It follows that the circuit court held the only party liable in this case that had been guilty of no negligence whatever, and, therefore, its judgment must be reversed. And inasmuch as the plaintiff could not upon a trial anew make out any case against this defendant, the cause will not be remanded. All concur.