Roy HEDGCORTH and Velma
Hedgcorth,
Plaintiffs-Appellants,

v.

MISSOURI PACIFIC RAILROAD COM-
PANY, a corporation, and St. Louis-San
Francisco Railway Company, a corpora-
tion, Defendants-Respondents.

No. 10263.

Missouri Court of Appeals,
Southern District,
En Banc.

June 8, 1979.

Motion for an Order by Dissenting Judge
for Transfer to Supreme Court Denied;
Motion for Rehearing Overruled; Mo-
tion for Transfer to Supreme Court
Denied July 5, 1979.

Retransferred to Court of Appeals
Jan. 25, 1980.

Charles E. Buchanan, L. R. Buehner, Buehner & Buehner, Joplin, for plaintiffs-appellants.

Gerald D. Morris, St. Louis, Laurence H. Flanigan, Flanigan & McCanse, Carthage, for defendants-respondents.

TITUS, Judge.

On January 29, 1971, plaintiff was a 10-year veteran mill foreman for Independent Gravel Company (Independent). He and other Independent employees were undertaking to raise and lock into place a fold-down door on one end of an empty "drop end gondola [railroad] car" when the 1,100 pound door fell and injured plaintiff's right foot and leg. St. Louis-San Francisco Railway Company (Frisco) owned the car and Missouri Pacific Railroad Company (MoPac) had delivered it to the siding where the accident occurred. Plaintiff et uxor sued both railroads and at the close of their evidence the trial court directed the jury to return a verdict for the defendants. This appeal ensued.

The fold-down doors at the ends of the car were hinged at the bottom and resting on the interior floor of the gondola when it was delivered onto Independent's siding. As was their practice, plaintiff and his crew intended to raise and secure in upright position the end doors so that the interior of the car could be cleaned before it was loaded with processed tailings or "chat." On the average of "once or twice a week" or "a good many times," plaintiff and his crew had encountered cars whose end doors were "out of shape," "bent and hard to raise" or "hard to move . . . with trouble." Before anything untoward happened on the concerned occasion and prior to the time plaintiff et alii undertook to raise the particular end door into place, each of them saw and it was "perfectly obvious" that the door was "sprung up away from the floor, the top edge of it was sprung bad," it "was out of shape . . . bent on the hinge end," "was bent" and "going to be hard to raise and required some sort of assistance." Albeit plaintiff had the right to "bad order" (reject) the car upon observing the condi-

tion of the end door, he didn't do so because "I didn't see anything too much different than others that I had put up. It was bent, we had put up a lot of bent ones."

When it became apparent that plaintiff and his crew would not be able to manually raise the end door into place because of its condition, supra, they determined to employ a method which had previously proved successful. One of the crew obtained a chain belonging to Independent. It was 18 to 20 feet long with hooks on either end and had been used in similar processes "time after time." One end of the chain was hooked onto the top of the end door; the other was hooked to the rear of an Independent-owned truck operated by an Independent employee. The idea was that when the truck was driven forward, the chain would pull the end door upright into place so that a catch could be dropped over the top of the door and hold it in place or that other methods could be used to position the door into place for loading of the car. Although the latching of the door could be accomplished from outside the car, plaintiff and another Independent employee remained inside during the door lifting procedure.

Two Independent employees and plaintiff testified in regard to the event in litigation. One employee recounted that the door had been pulled by the chain and truck to "about a 45 degree angle . . . if not more" before a link in the chain broke allowing the door to fall back into its original position inside the railroad car. The other employee opined the door "did not even get half way [sic] off the floor" before the chain broke. On direct examination plaintiff agreed with the others but on cross-examination acknowledged that when he deposed before trial he had stated the chain broke, causing the door to fall, after the door was pulled upright and struck against the retaining flanges on the end of the car. Including plaintiff, the witnesses were of one mind that it "was the breaking of the chain that was the unusual circumstance that happened that day" and that "the only thing that was different on this occasion from any other occasion when you

had this problem presented to you was that on this occasion, the chain broke." Plaintiff's foot was caught by the falling end door as he, still inside the car, stepped forward "to drop the catch down over the top of the door" at the same instant "the chain snapped." Following the casualty, the crew used the "same procedure," with a different chain, to raise the door "up and blocked up under it so it would stay up so we could load it."

It is interesting to note that in the argument portion of plaintiff's brief, he repeats: "The evidence clearly shows that the bent and defective condition of the door was an apparent and obvious condition and therefore discernible by visual inspection. . . . The evidence above shows that the bent condition of the door was an obvious and visible defect. Further, the evidence shows that the visible condition of the door, alone, was sufficient to indicate that the door would be difficult to move. . . . The above discussion shows that there is an abundance of specific evidence concerning the nature of the defect in the door and concerning the fact that the defect was easily discoverable by a visual inspection."

By now it is axiomatic that when a railroad delivers a car to a consignee whose employees are to load or unload it, the railroad is negligent if it fails to exercise ordinary care to see that the car is in such condition that the consignee's employees, if exercising due care for their own safety, can enter the car with reasonable safety for loading or unloading it and either to make repairs, if required, or warn of any unsafe condition. *Sampson v. Missouri Pacific R. Co.*, 560 S.W.2d 573, 578–579[2] (Mo. banc 1978). Notice should be made that the duty just described is in the disjunctive, not conjunctive. In other words, the railroad must either repair *or* warn—not both.

We surmise that plaintiff's repetitive arguments above quoted anent the evidence making it clear that the door was obviously and easily discoverable to be defective and difficult to move, were designed to augment his assertions that defendants did not perform their inspection duties and failed to either remedy or warn of the defect. But even acceptance of the proposition that defendants initially did, in fact, breach their duties, their duties became discharged when the defect became "equally apparent or observable by a person of ordinary intelligence and experience who undertakes the [loading or] unloading of a railroad car as a consignee." *Southern Pac. Transp. Co. v. Reed*, 114 Ariz. 167, 559 P.2d 1082, 1083[2] (Ct.App.1976); *Garner v. Pacific Electric Railway Company*, 202 Cal. App.2d 720, 21 Cal.Rptr. 352, 360 (1962); 75 C.J.S. Railroads § 924, at p. 335; cf. *Reed v. Missouri-Kansas-Texas R. Co.*, 362 Mo. 1, 7–8, 239 S.W.2d 328, 332 (banc 1951). This comports with the rule that a possessor has no duty to warn his invitees of premises' defects which are as well known to the invitee as to the occupant, or which are obvious or should have been observed by the invitees in the exercise of ordinary care. *Bohler v. National Food Stores, Inc.*, 425 S.W.2d 956, 958–959[1, 2] (Mo.1968); *Coleman v. Buehner*, 444 S.W.2d 16, 22[2] (Mo. App.1969).

Even if the breaking of the chain link, owned by Independent and which probably caused the door to fall, be ignored as the lone cause of the accident, plaintiff's evidence unerringly demonstrates that prior to any attempts to raise the door, he and all members of his crew were fully cognizant of the door's defects which, plaintiff contends, caused the casualty. This knowledge obviated any duty on the part of Frisco or MoPac to warn that the door did not function properly for, as previously seen, no duty on defendants' part existed to warn plaintiff of that which he already knew. Plaintiff was Independent's employee. He was not supervised by the defendants. Therefore, when plaintiff chose, despite knowledge of the defect in the railroad car, to proceed with methods selected by him in raising the door and was injured, his injuries were not defendants' responsibility. *Glusac v. Atchison, Topeka & Santa Fe Railway Co.*, 52 Cal.Rptr. 417, 420–421[7, 8] (Ct.App.1966).

In epilogue we say: Irrespective of the trial court's reason for sustaining defendants' motions for directed verdict, if it properly did so its announced reason for doing it is immaterial on appeal. *Stewart v. Zuellig,* 336 S.W.2d 399, 402[1] (Mo.1960).

The judgment nisi is affirmed.

BILLINGS, J., concurs.

MAUS, J., dissents in separate dissenting opinion.

HOGAN, J., concurs in separate concurring opinion.

FLANIGAN, C. J., recused.

GREENE, J., not participating because not a member of the court when cause was submitted.

HOGAN, Judge, concurring:

I take it as a rule of universal application that when a party's own presentation of his case destroys his right to recover or his defense, the trial court should so declare. *Rogers v. Thompson,* 364 Mo. 605, 615, 265 S.W.2d 282, 287[1] (banc 1954); *Peoples Finance Corporation v. Buckner,* 344 Mo. 347, 350, 126 S.W.2d 301, 302–303[3] (1939); *Coats v. Sandhofer,* 248 S.W.2d 455, 457–458[4] (Mo.App.1952); 88 C.J.S. Trial § 258(d) (1955). I concur because in my view the plaintiff's evidence conclusively establishes his assumption of risk and negates his right to recover. I am in no doubt there is a dearth of Missouri authority on the very point decided; there was a day when assumption of risk was no defense to an action based on negligence, *Markley v. Kansas City So. R. Co.,* 338 Mo. 436, 90 S.W.2d 409, 411 (1936), but that is no longer the case. The doctrine of assumption of risk may now apply to preclude recovery in negligence cases except when the action involves a master and servant relation, *Terry v. Boss Hotels, Inc.,* 376 S.W.2d 239, 247[15–17] (Mo.1964), and the duty owed by a railroad to a consignee's employees is not based upon any contract between the carrier and the consignee's employees; it is a " . . . tort liability, imposed by law, growing out of the railroad's duty to persons who it might reasonably anticipate would use the car in such a manner as to be injured by the defect." *Markley v. Kansas City So. R. Co.,* supra, 338 Mo. at 442, 90 S.W.2d at 411; *Sykes v. St. Louis & S. F. R. Co.,* 178 Mo. 693, 712–713, 77 S.W. 723, 728 (1903). There is no suggestion here that the case is controlled by 45 U.S.C.A. § 54, which in effect abolishes the defense of assumption of risk in F.E.L.A. cases. Moreover, there is a long line of authority holding that when the condition (here the defective gondola door) which gave rise to the danger of injury is open and visible, and the danger is such that it should be apparent to and appreciated by a person of ordinary intelligence, the consignee's employee assumes the risk of injury if he uses the defective car. See *Southern Ry. Co. v. Edwards,* 44 F.2d 526 (5th Cir. 1930); Annot., 106 A.L.R. 1140 (1937).

I fully realize that "assumption of risk" is difficult to distinguish from contributory negligence; I also realize that the general knowledge that an injury might result without appreciation of the risk to which a defendant's conduct exposes him is not sufficient. *Bullock v. Benjamin Moore and Company,* 392 S.W.2d 10, 14[10] (Mo.App. 1965). Here, however, we are not concerned with the sort of remote contingency involved in *Bullock,* and as there stated, "[I]f the danger is so apparent that a reasonable person would and should have seen it and recognized it, . . . plaintiff will [not] be heard to say that he did not recognize or appreciate it." *Bullock,* supra, 392 S.W.2d at 14.

Here, the plaintiffs' evidence indicates that plaintiff Roy Hedgcorth was loading gondola cars. The end doors fold inward, and they do sometimes become bent. The doors can be raised with a chain hoist or "tug-it" from the outside, and if the doors are functioning properly, three men can lift the door from the inside. If a chain hoist has to be used, one should not stand inside the car, because, as witness Rosenberry testified, " . . . [T]hat's a dangerous place to be." There was some evidence that the end doors on these gondola cars weigh

more than 1,000 pounds. The doors latch when they are moved into proper position, and that can be done as well from the outside as from the inside. There was evidence from several witnesses that defective gondola cars could be rejected—"bad ordered"—if they were defective.

Plaintiff Roy Hedgcorth was a mill foreman with "[A]bout ten years" experience loading gondola cars when the accident occurred. The particular car in which he was injured appeared at first to be "about as good as any of them." Upon attempting to raise the door—from the inside of the car—plaintiff and two other men attempted to raise it manually. Plaintiff knew the end door he was attempting to raise was bent. He and two other men—one of whom had a "bar"—then remained inside while a truck driver "hooked onto it and tried to pull it up." As the principal opinion notes, the chain broke and the plaintiff was injured.

If the only questions here were whether it was safe to use the truck and chain to raise the defective door and whether the plaintiff stood in a dangerous position while the door was being raised, I think the appeal would involve only contributory negligence, rather than assumption of risk. As it is, the plaintiff himself showed conclusively that he had as much knowledge of the risk as the defendant, at least after he and two other men had attempted to raise the door. The plaintiff should have appreciated that the door weighed more than 1,000 pounds, that the door was not secure until it was latched, and to my mind the risk of having the 1,000 pound door fall backward was so obvious that any reasonable person should have recognized it. When it was discovered that the door could not be raised manually by three men, that it would take three men, a pry bar and a winch to raise it, plaintiff still had a clear alternative: he could have rejected the car and he could have done so, for all the record shows, without fear of economic reprisal.

I bear in mind that the doctrine of assumption of risk has been criticized as a product of the Industrial Revolution, designed (or invented) to relieve the employer of burdens he ought to bear, Bohlen, Voluntary Assumption of Risk, 20 Harv.L.Rev. 14, 30–32 (1906), but today's overorganized industrial employees scarcely require the same degree of judicial solicitude as those of Dickens' day. I believe, as the principal opinion holds, that the result there reached may well be rationalized on the basis of a want of duty to warn, but I also believe that the plaintiff was barred by voluntary assumption of risk. In either case, the trial court properly directed a verdict for the defendant. Because the plaintiff had no case to submit, any trial error was immaterial. *Howard v. Johnoff Restaurant Company*, 312 S.W.2d 55, 56[1] (Mo.1958); *O'Dell v. Dean*, 356 Mo. 861, 863, 204 S.W.2d 248, 249[1] (1947).

MAUS, Judge (dissenting).

I must respectfully dissent. The majority opinion holds that the plaintiff did not make a submissible case because he knew the door was bent. Thereby, the defendants did not breach their duty to exercise ordinary care to provide a reasonably safe car and either make repairs *or warn* of an unsafe condition.

I do not believe that plaintiff's knowledge of the bent door per se bars the plaintiff from submitting his case to the jury. Such a holding is tantamount to holding that the plaintiff was required to establish that he did not know and by using ordinary care could not have known of the dangerous condition. While *Sampson v. Missouri Pacific R. Co.*, 560 S.W.2d 573 (Mo. banc 1978) uses language of warning, that case expressly approves a verdict directing instruction which in no way submits the plaintiff's lack of knowledge of the defective condition.

The liability of the railroad has been compared to the liability of a possessor of land to invitees. If that be the correct measure of the railroad's duty, the plaintiff is confronted with the requirement set forth in numerous cases [1] and summarized in MAI

1. For example, *Sellens v. Christman*, 418 S.W.2d 6 (Mo.1967).

22.03 "Second, plaintiff did not know and by using ordinary care could not have known of this condition." *Of course*, in paragraph first that instruction submits a finding of a defective condition and "as a result the floor was not reasonably safe for customers." But, even under the rule summarized by paragraph second, the plaintiff's knowledge the door was bent should not defeat his submissible case. The decisive question is whether or not an invitee must prove that he had *no* knowledge, actual or constructive, of the physical condition, or if his evidence must show no knowledge, actual or constructive, that the condition was not reasonably safe. Or, stated alternatively, is a possessor (railroad) absolved only if the invitee has actual or constructive appreciation of the risk involved.

Strangely, I find a dearth of authority in this state on this precise point. Perhaps, this is because the language, knowledge of the "condition", by implication includes knowledge of the risk involved.[2] Perhaps it is because the cases using such terminology have dealt with defects and circumstances under which the plaintiff upon knowing of the defect would, as a matter of law, be held to appreciate the risk involved.[3]

The Restatements, Law of Torts, have been regarded, if not authoritative, certainly as persuasive, by our courts.[4] Restatement (First) of Torts § 340 provides a possessor is not liable to invitees or licensees "if they know of the condition and *realize the risk involved therein.*"[5] (Emphasis added) Paragraph b of the comment to this section states: "The words 'the risk' denote not only the existence of a risk but also its extent. Thus, 'knowledge' of the risk involved in a particular condition implies not only that the condition is recognized as dangerous but also that the chance of harm and the gravity of the threatened harm are appreciated."[6]

Recently adopted MAI 22.07 requires only a finding that a licensee "did not know and by using ordinary care could not have discovered that *such condition was not reasonably safe.*" (Emphasis added)

The rule that an invitee as a part of his cause must establish that he had no knowledge, actual or constructive, of the condition (referred to as the "no duty rule") is similar to the defense of contributory negligence.[7] For a defense of contributory negligence to be valid, it is essential that a plaintiff appreciate the risk.[8]

---

2. "Dangerous condition," *Cupp v. Montgomery*, 408 S.W.2d 353, 358 (Mo.App.1966) "Where the danger is obvious or known to the invitee he consents to the risk and the inviter owes no duty." *Sellens*, supra, n. 1, at p. 9.

3. A greasy floor, *Hokanson v. Joplin Rendering Company, Inc.*, 509 S.W.2d 107 (Mo.1974); an open tressle, *Arbogast v. Terminal Railroad Assn. of St. Louis*, 452 S.W.2d 81 (Mo.1970); an empty elevator shaft, *Senseney v. Landay Real Estate Co.*, 345 Mo. 128, 131 S.W.2d 595 (1939).

4. *Hokanson*, supra, n. 3; *Wells v. Goforth*, 443 S.W.2d 155 (Mo. banc 1969); *Albers v. Gehlert*, 409 S.W.2d 682 (Mo.1966); *Weber v. Hinds*, 440 S.W.2d 129 (Mo.App.1969).

5. *Wells*, supra, n. 4 adopted § 342 of Restatement (First) of Torts; § 340 is to be considered *in conjunction with* § 342.

6. Restatement (Second) of Torts §§ 342 and 343A and the comments thereto have similar language.

7. "Clearly the no duty rule also bears a strong resemblance to the doctrine of contributory negligence, and it has been stated that while it is often difficult to determine from the language used by the court in a particular case whether recovery was denied under the no duty rule, or on the theory of assumption of risk, or of contributory negligence, regardless of the terms employed, the underlying principle on which the court relied was contributory negligence." 62 Am.Jur.2d, Premises Liability, § 71, p. 323. In *Daniel v. Childress*, 381 S.W.2d 539, 542 (Mo.App.1964) this court said: "[W]e find it unsatisfying to consider negligence of the master and assumption of risk of the employee separately, for the same facts determine both negligence and assumption of risk, and there is really only one question."

8. "In a situation in which one's knowledge of general conditions from which danger arose is not necessarily knowledge and appreciation of that danger, before one charged with contributory negligence can be convicted thereof, there must be a finding that he acted or failed to act with knowledge and appreciation, actual or constructive, of the danger of injury which his conduct involved." *Koirtyohann v. Washington Plumbing & Heating Co.*, 471 S.W.2d

It is true that to establish liability an invitee must establish that a possessor had actual or constructive knowledge of the defective condition. By necessary implication this would mean an appreciation of the risk involved. It may then be argued, as so often stated, that the liability of the possessor is based upon superior knowledge [9] and if the invitee knows of the defect, there can be no superior knowledge, actual or constructive. However, this argument does not take into consideration the relative positions of the parties under the circumstances. For example, the railroad had possession of the car for such length of time as it determined. It was the duty of the railroad to exercise reasonable care to see that employees could use the car for loading or unloading with reasonable safety. This included the duty to inspect.[10] On the other hand, the plaintiff was confronted with a car which needed to be used without delay to carry on the business of his employer. A jury could find that the possessor in the exercise of ordinary care should discover the condition and appreciate the risk when an invitee need not do so.[11]

For the reasons stated, I am persuaded that the fact the plaintiff knew the door was bent does not mean that he did not make a submissible case. Before the plaintiff's knowledge destroys his submissible case, it should be required that the plaintiff had actual or constructive knowledge that to attempt to raise and lock the door was not reasonably safe.[12] This is not conclusively established by the evidence. In fact, the evidence could be found to demonstrate the contrary. The railroad, if not habitually, at least frequently delivered cars with similar defects. The plaintiff had many times used those cars, even with the aid of the truck to raise the door, without incident. There was evidence that had plaintiff rejected all cars similar to the one in question, he would have rejected about half of the cars provided by the defendant. He said he thought the car was reasonably safe. Under the circumstances his knowledge, actual or constructive, of the risk involved should be for the jury.

However, the action of the trial court must be sustained if the plaintiff's evidence did not establish the defendant's negligence was the proximate cause of his injury. This point is approached with considerable reluctance for "There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion." Prosser on Torts, § 41, p. 236 (4th Ed. 1971). The question is: was the bent door, which the jury could find not reasonably safe because it could not be raised to an upright position where it could be locked, as a matter of law not the proximate cause of plaintiff's injuries?

217, 221 (Mo.1971). Also, *Burk v. Missouri Power & Light Company*, 420 S.W.2d 274 (Mo. 1967); *Bollman v. Kark Rendering Plant*, 418 S.W.2d 39 (Mo.1967).

9. *Sellens*, supra, n. 1; *Kenward v. Hultz*, 371 S.W.2d 344 (Mo.App.1963); *Dixon v. General Grocery Company*, 293 S.W.2d 415 (Mo.1956).

10. *Settle v. Baldwin*, 355 Mo. 336, 196 S.W.2d 299 (1946); *Stoutimore v. Atchison, T. & S. F. Ry. Co.*, 338 Mo. 463, 92 S.W.2d 658 (1936).

11. In *Brice v. Union Electric Co.*, 550 S.W.2d 629 (Mo.App.1977) an invitee was not barred by failing to discover a protruding nail in a junk yard when the possessor was held to have constructive knowledge. The superior knowledge of the invitee was of importance in *Hokanson*, supra, n. 3. In *Kenward*, supra, n. 9, the fact the plaintiff who was working in the bottom of a trench, was a graduate engineer was significant. Compare *Albers*, supra, n. 4, where the defendant required the plaintiff to walk over an icy walk.

12. In *Larson v. Atchison, T. & S. F. Ry. Co.*, 364 Mo. 344, 261 S.W.2d 111 (1953), a railway mail clerk heard another say "watch the catcher arm, that it worked hard," yet the court said 261 S.W.2d at p. 115 "It may not be said here that the plaintiff received such a warning or had such knowledge that the railroad had discharged its obligation to him." The statement of the court in *Brice v. Union Elec. Co.*, 550 S.W.2d 629, 632 (Mo.App.1977), where an invitee stepped on a nail in a junk yard seems appropriate: "[H]owever, his knowledge of the general condition from which the danger arose did not necessarily constitute knowledge and appreciation of the danger actually encountered."

The opinions do not establish a definition of proximate cause which can be uniformly applied in all cases.[13] One test has been said "to be whether 'the facts show that the injury would not have occurred in the absence of the negligent act.'" *Dintelman v. McHalffey*, 435 S.W.2d 633, 636 (Mo.1968). This could more properly be called a test of causal connection. "The causal connection must be proved, but direct proof of the connection is not required, it being sufficient if the facts proved are of such nature and so connected and related that the conclusion of causal connection may be fairly inferred. . . . Plaintiff's evidence need not exclude all other possible causes, save that of defendant's negligence; she has met her burden once she establishes causal connection and beyond that, other possible causes, if any, are a matter of defense." *Joiner v. Kurt's Chip-A-Way Park, Inc.*, 510 S.W.2d 773, 775 (Mo.App. 1974).

In this case, the jury could find that the bent door necessitated the use of the chain and the truck; and that because it was bent the door could not be raised to the anticipated position and the chain broke. It could be reasonably inferred that absent the bent door the injury would not have occurred.

However, the test of causal connection does not per se establish proximate cause. Causal connection could extend liability beyond the limits otherwise imposed by the law. For example, the act of one leaving the keys in an automobile, which is stolen by a thief who negligently injures a plaintiff, has been held to be not the proximate cause of such injuries.[14] There have been many other definitions of proximate cause.

"'Generally, it is sufficient to constitute proximate cause that the negligence charged was the efficient cause which set in motion the chain of circumstances leading up to the injury. The test is not whether a reasonably prudent person would have foreseen the particular injury but whether, after the occurrences, the injury appears to be the reasonable and probable consequences of the act or omission of the defendant.' . . . 'Proximate cause is commonly, and best, defined as that cause which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produced the result complained of, and without which the result would not have occurred. . . . In other words, it is sufficient to constitute proximate cause that the negligence for which recovery is sought was the efficient cause which set in motion the chain of circumstances leading up to the injury itself . . . . and the primary cause will be the proximate cause where it is so linked and bound to the succeeding events that all create or become a continuous whole, the first so operating upon the others as to make it primarily productive of the injury. . .'" *Thebeau v. Thebeau*, 324 S.W.2d 674, 678 (Mo. banc 1959). Also see *Foley v. Hudson*, 432 S.W.2d 205 (Mo.1968).

Often the question of proximate cause is most appropriately resolved by a determination of whether or not the injuries were the result of an efficient, intervening cause. *Dickerson v. St. Louis Public Service Company*, 286 S.W.2d 820 (Mo. banc 1956). This lends no easy solution, but leads to a determination of what is an efficient, intervening cause.

A general definition is "an efficient, intervening cause is a new and independent force which so interrupts the chain of events as to become the responsible, direct, proximate and immediate cause of the injury." *Dickerson v. St. Louis Public Service Company*, supra, at 824.[15] Perhaps the best way to narrow the definition for this case is a definition of what is not an intervening cause. "The intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in

---

**13.** *Boyd v. Terminal Railroad Association of St. Louis*, 289 S.W.2d 33 (Mo.1956).

**14.** *Dix v. Motor Market, Inc.*, 540 S.W.2d 927 (Mo.App.1976).

**15.** The factors to be considered are set forth in Restatement (Second) of Torts § 442.

bringing about." Restatement (Second) of Torts § 443, p. 472.[16]

When the railroad repetitively supplied defective cars, which had been used without injury, it was a normal consequence that an attempt would be made to use the car in question. "Thus, . . . a defendant will be required to anticipate . . . that workmen who are furnished with a defective appliance may be expected to try to make it work . . . ." Prosser, Torts, § 44, pp. 273–274, (4th Ed. 1971). The jury could find the door was not only difficult to raise, but could not be raised to the anticipated position and thereby the chain broke. After the event, knowing this situation, it should not be said as a matter of law the breaking of the chain was so extraordinary as to be an intervening cause.

It is no answer to assert the plaintiff was guilty of contributory negligence. If he was, that conduct might be an intervening cause, but those are questions for the jury.[17] If he was not, his normal reaction to the situation should not be said to be an intervening cause. The same considerations apply to the conduct of those assisting the plaintiff, with the additional observation that even assuming those fellow employees were negligent, unless that negligence be imputed to the plaintiff, such negligence should not bar the plaintiff.[18]

"Cases might be cited pro and con ad infinitum on this subject but, after all, each case depends upon its own particular facts and it is seldom that one decision really controls another." *Price v. Seidler*, 408 S.W.2d 815, 820 (Mo.1966).[19]

"Usually, of course, the question of proximate cause (either sole or concurring) is a jury question." *Dickerson v. St. Louis Public Service Company*, supra, at 826. Also, *Robinson v. St. John's Medical Center, Joplin*, 508 S.W.2d 7 (Mo.App.1974).

By this unduly long dissent, I do not intend to, and also do not think I advocate any new principles of law. "In this matter questions of proximate cause and efficient, intervening cause are inseparably interwoven. They are not easy of solution, and we repeat the oft-used principle that in this determination each case must stand on its own individual facts; the final result boils down largely to a construction of the evidentiary situation." *Dickerson v. St. Louis Public Service Company*, supra, at 824. I do believe that under the particular circumstances of this case, where the railroad repetitively supplied cars with bent doors, the plaintiff and others through various devices, including the use of a chain and a truck, used those cars without injury, the issues of the railroads' negligence (including plaintiff's constructive appreciation of the risk), proximate cause, and plaintiff's contributory negligence should, under proper instructions, be submitted to a jury.

---

**16.** "The word 'normal' is not used in this Section in the sense of what is usual, customary, foreseeable, or to be expected. It denotes rather the antithesis of abnormal, or extraordinary. It means that the court or jury, looking at the matter after the event, and therefore knowing the situation which existed when the new force intervened, does not regard its intervention as so extraordinary as to fall outside of the class of normal events." Restatement (Second) of Torts § 443, pp. 472–473.

**17.** "However, we need not prolong this opinion by a discussion of proximate cause, for defendant's argument on this subject is commingled and merged with his argument that plaintiffs' decedent was guilty of contributory negligence as a matter of law . . . ." *Walker v. Massey*, 417 S.W.2d 14, 21 (Mo.App.1967). For a

discussion of intervening cause and contributory negligence see 57 Am.Jur.2d, Negligence § 218 (1971). For a discussion of this aspect in an F.E.L.A. case see *Boyd*, supra, n. 13.

**18.** Unless that negligence is so extraordinary as not to be reasonably foreseeable. *Dickerson v. St. Louis Public Service Company*, 286 S.W.2d 820, 825 (Mo. banc 1956).

**19.** The following cases seem worthy of note. *Dickerson*, supra, n. 8; *Boyd*, supra, n. 13; *Price v. Seidler*, 408 S.W.2d 815 (Mo.1966); *Green v. Kahn*, 391 S.W.2d 269 (Mo.1965) and *Gathright v. Pendegraft*, 433 S.W.2d 299 (Mo. 1968). A collection of cases is set forth in *Strake v. R. J. Reynolds Tobacco Co.*, 539 S.W.2d 715 (Mo.App.1976).