GEORGE ALLEN v. LARABEE FLOUR MILLS CORPORATION and UNION TERMINAL RAILWAY COMPANY, Appellants.—40 S. W. (2d) 597.

Division One, June 24, 1931.

*G. L. Zwick* and *O. E. Shultz* for appellant Larabee Flour Mills Corporation.

*Mytton, Parkinson & Norris* for respondent.

228

FERGUSON, C.—This is an action for damages for personal injuries alleged to have been sustained by plaintiff while employed by the defendant Larabee Flour Mills Corporation. The Union Terminal Railway Company, a corporation, was joined as defendant.

The petition alleges that plaintiff was employed by the defendant Larabee Flour Mills Corporation, and that he was injured on the 18th day of January while engaged "in the work of operating a shovel and unloading a car load of wheat" which had been delivered to defendant Larabee Flour Mills Corporation at its milling plant in the city of St. Joseph, Missouri. The petition describes the size, mechanism and manner of operating the "power shovel" used for the unloading of wheat from railroad cars. Negligence is charged as follows: "That the car which the plaintiff was unloading said wheat from had been coopered by the defendant Larabee Flour Mills Corporation, and the defendant Union Terminal Railway Company, and by arrangement between them, and said defendants carelessly and negligently caused said car to be coopered in such a manner that an obstruction was placed upon the floor for the purpose of covering a hole in the floor of said car, so that the same extended above the surface of the car a considerable distance, and rendered it certain that when wheat was loaded into the car an operator operating the shovel would likely be injured by reason of said shovel coming in contact with said obstruction; that the defendants coopered said car well knowing that it was to be loaded with wheat, which was to be unloaded at the defendant Larabee Flour Mills Corporation's mill, and the defendant Union Terminal Railway Company did its part of coopering said car for the defendant Larabee Flour Mills Corporation, and both of said companies negligently coopered said car and negligently failed to inspect the same, and negligently caused the same to be furnished and wheat to be loaded in the same, and negligently loaded wheat in the same, and caused said car to be

transported to the unloading dock of the defendant Larabee Flour Mills Corporation, and negligently caused and permitted the plaintiff to use a power-shovel as hereinabove set forth, in the unloading of said wheat from said car; that the coopering of said car in said manner created a hidden and inherently dangerous instrumentality and appliance and work and place of work for employees engaged in the work of unloading said wheat." The petition then alleges that on the day aforesaid "the plaintiff while in the exercise of care, was engaged in the work of unloading said car and holding said power-operated shovel, and in using said shovel and sinking the same into the wheat, the same came in contact with said obstruction upon the bottom of said car, and then and thereby threw and jerked the plaintiff with great force and violence." The injuries the plaintiff claims to have received are set out and damages asked in the sum of $50,000.

Defendants filed separate answers.

At the conclusion of plaintiff's evidence the defendant Union Terminal Railway Company's demurrer to plaintiff's evidence was sustained, whereupon plaintiff took an involuntary nonsuit as to said defendant Union Terminal Railway Company, with leave to move to set the same aside.

The demurrer to plaintiff's evidence offered by the defendant Larabee Flour Mills Corporation was overruled. At the close of all the evidence in the case the defendant Larabee Flour Mills Corporation offered a demurrer to the evidence, which the court overruled, and the case was thereupon submitted to the jury as to that defendant alone. The jury returned a verdict finding the issues for the defendant. Plaintiff's motion for a new trial was sustained, the grounds assigned by the court therefor being that error was committed in giving defendants instructions numbered 1, 5, 8, 9 and 10. From the action of the court in granting plaintiff a new trial, defendant Larabee Flour Mills Corporation appealed.

Plaintiff was employed by the Larabee Flour Mills Corporation as a "scooper" on January 14, 1924, and the injury which he is alleged to have sustained occurred four days later on January 18, 1924. He had had "five or six years'" experience in that kind of work. The Larabee Flour Mills Corporation had wheat stored with the St. Joseph Public Elevator Company, for which it held warehouse receipts. The St. Joseph Public Elevator Company was an independent corporation, having no connection whatsoever with the milling corporation, and is duly licensed to do a public warehouse business. As from time to time the milling corporation would make withdrawals from its wheat stored with the elevator company its employee in charge of that part of the business would call the elevator company by telephone and order and direct that a specified

number of cars of wheat per day be loaded out during a definite period of time, whereupon the elevator company would make a request on the Union Terminal Railway Company to be supplied with the number of cars to be loaded each day. The Terminal Company is a common carrier supplying and furnishing facilities for switching, moving and transporting freight and railroad cars for railroads and industries in and near St. Joseph, Missouri. When the cars to be used in transporting the grain were ordered from the Terminal Company, that company would proceed to cooper the cars—that is, install grain doors, "stop leaks," "put the cars in shape for loading" and "in case a car was leaking they papered or boarded it or whatever was necessary to prevent leakage—prevent grain from coming out of the car" or "if there is a leak in the floor they put something on, papers, lath, various things on the floor to stop the leakage." The Terminal Company would then deliver the cars to the Elevator Company for loading, and generally the cars were marked "OK" with chalk by the Terminal Company's car cooper. Neither the milling corporation nor the elevator company had any facilities for nor undertook the coopering of cars. The loading was done by the elevator company. The assistant foreman of the elevator company describes the method of loading as follows: "The grain is run into the scale bin, then through a big, long spout into the car; the spout goes into the car with a kind of horn both ways, branches out." The owners of the grain had nothing to do with either coopering or loading the car. When the cars were loaded they were then transported by the Terminal Company to the unloading dock of the milling corporation, the charges therefor being paid by the milling corporation. The milling corporation removed the grain from the cars by means of a large automatic scoop or shovel which was propelled or drawn by electric power. The shovel or scoop was placed and guided by the "scooper" who was in charge of and operated it. Oft times the scoop or shovel would strike or come in contact with obstructions in the floor of the car, such as a cleat or bolt or boarding nailed to the floor to prevent leakage of grain, and at such times the operator of the scoop would raise one end of the shovel and try to "slide" it over the obstruction. On the 18th day of January, 1924, plaintiff was working for defendant milling corporation as a scooper in charge of one of its power shovels and engaged in the unloading of a car of wheat which stood at defendant's unloading dock, having been consigned to the milling corporation by and from the elevator company and transported and placed for unloading by the Terminal Company. The car in which plaintiff was working was one of several cars, all of which had been ordered, coopered, loaded, consigned and transported in the manner we have described. The scoop or shovel which plaintiff was operating came in contact with an obstruction

on the floor of the car, and plaintiff says that he was thereby "twisted, thrown and jerked with great force and violence and was injured." The plaintiff and other workmen, using hand scoops, then removed the wheat which covered and concealed the obstruction, and plaintiff describes the obstruction which they discovered as being a box "about twelve or fourteen inches square, made of pine lumber, toe-nailed to the floor with the open side of the box down and standing six or eight inches high from the floor of the car." The box was so securely nailed that plaintiff was compelled to use an iron bar to pry it loose. It evidently had been so placed in coopering the car as to cover a hole in the floor. Plaintiff reported to his foreman that he "was hurt by the scoop" and a report of the accident was made to the company's office. The foreman testified, and plaintiff did not deny the conversation, that plaintiff at the time said, "he didn't think he was hurt to amount to anything—thought it was just a bruise or kind of sprain and didn't want to go to a doctor." Plaintiff testified at the trial that he immediately suffered severe and sharp pain in the back and groin which continued during the remainder of the day and the night. However, plaintiff reported for work on the next day after the accident and worked regularly thereafter as a scooper for the Larabee corporation until the following October, about nine months after the accident, when he went to work for an elevator corporation where he worked at binning wheat until May, 1925. In July, 1925, he again went to work for the Larabee corporation as a scooper and continued at that work until October 26, 1926, when for the first time, and being two years and nine months after the accident, he consulted and was treated by a physician. The physicians who treated him testified he was suffering from arthritis and that the arthritis was not caused by the alleged trauma, but gave it as their opinion, based upon the history, as stated by plaintiff, that the trauma may have been the exciting cause of the acute condition which plaintiff says followed the alleged injury and continued with increasing frequency and severity until he went to the physician for treatment. The evidence sustained the allegations of plaintiff's petition as to the obstruction on the floor of the car, and it is conceded that the obstruction could not have been discovered after the car was loaded with wheat.

While appellant contends that certain of its given instructions, declared, as grounds for a new trial, to be erroneous, are correct and free from error, its first contention, and the one stressed here, is that its demurrer to the evidence should have been sustained. It follows therefore that if this primary contention of appellant be correct it is immaterial whether the instructions given were right or wrong.

We have briefly stated the facts developed by the testimony and

under these facts we think it readily appears that the status of the Larabee Mills Corporation was merely that of a consignee. It had nothing to do with the selection, coopering or loading of the cars in which grain was loaded and transported to its unloading dock. The milling corporation had no authority or control over the employees of either the Terminal Company or the Elevator Company and cannot therefore be held responsibile for their negligent acts, if any. The Terminal Company owed a duty to the milling corporation and its employees, who might be required in the performance of their duties in unloading to work in, upon and about the cars, to supply cars which were reasonably safe, fit and suitable for the purpose for which they were intended to be used and to properly cooper such cars. [Roddy v. Railway Company, 104 Mo. 234, 15 S. W. 1112; Smith v. Anderson Motor Service Company (Mo. App.), 273 S. W. 741, 1. c. 744.] The duty of a common carrier in relation to employees of a consignee in unloading railroad cars is discussed on the facts of that case in Applegate v. Railroad Company, 252 Mo. 173, 158 S. W. 376.

To comply with the duty imposed by law upon the master to furnish the servant with reasonably safe appliances with which to work and a reasonably safe place in which to work, a master is not required to inspect or cause to be inspected, for defects therein, before same are loaded, cars supplied by a common carrier for the transportation of freight to him as a consignee because his servants in unloading the cars will be required to go in and upon them. Where a Railroad Company delivers and places a car loaded with freight to be unloaded by the consignee, such consignee has a right to presume that the car is in proper and safe condition unless the contrary appears without particular or technical inspection, "and in the absence of obvious defects or knowledge of some facts or circumstances actually or constructively brought home" to him which would put an ordinarily prudent person "on such inquiry as to lead to knowledge of a contrary condition," the consignee is not liable for injuries resulting to his servant while working on, in, or about such car in unloading it, by reason of some defective condition thereof. [Gager v. Stolle-Brandt Lumber Co., 149 Wis. 154.] In the instant case it is conceded that the defective and dangerous coopering of the car for the purpose of covering a hole in the floor was entirely concealed and hidden when the car was loaded with wheat as it was when delivered to defendant's plant and placed for unloading. Such defective condition was not obvious and no circumstances existed to put the master upon inquiry.

Respondent relies upon the rule that the master must exercise reasonable care to furnish his servant with safe appliances and a

reasonably safe place to work. "This rule, however, is based on the possession, use, and control by the master of the appliances used and the premises where the servant's work is performed, and is not ordinarily applicable to cases where such appliances or premises are owned and controlled by a third person." [Gillespie's Exrs. v. Howard (Ky.), 294 S. W. 154.] The rule invoked is not applicable to this case for the car was the property of the Terminal Company or some other carrier and it was supplied, coopered, moved and controlled solely by the Terminal Company while the milling corporation was merely the consignee of the wheat loaded in the car. It exercised no control over and made no use of the car except to unload it. In 18 Ruling Case Law, page 585, it is said, "As a general rule the peculiar duties that an employer owes to his employees relate only to the premises and instrumentalities over which the employer has complete control and dominion. Otherwise he might be made responsible for the negligence of third persons with reference to premises he had never seen, and about the condition of which he knew, and perhaps could know, nothing."

Respondent cites cases where the master is held liable for injuries received by his servant while *using* a defective car furnished by a railway company for the purpose of loading. The cases cited are: New Ohio Washed Coal Co. v. Hinman, 119 Ill. App. 287; Peter C. McCallion v. Mo. Pac. Railroad Co., 88 Pac. 50; Spaulding v. W. N. Flynt Granite Co., 159 Mass. 587, 34 N. E. 1134; D'Almeida v. Boston & Maine Railroad Co., D'Almeida v. Boott Mills Co., 209 Mass. 81, 95 N. E. 398. However, an analysis of the cases bearing on the question under discussion reveals a clear distinction between a case such as we have here, where the master is merely a consignee (or consignor) and the car is being unloaded (or loaded), and the cases respondent cites, wherein the master has taken temporary charge of the car, making use of it in the operation of his business, and making of it one of the appliances or instruments of his business so as *pro tempore* to adopt it as his own, thereby becoming as to his servant the owner and under the same duty to the servant as if he were the owner. We have not found any case which holds that the master, being merely a consignee of freight delivered to him by railroad car for the sole purpose of unloading same, is liable to his servant for injury caused by some defective condition of the car. Upon such state of facts the rule is that the master is not liable. [McMullen v. Carnegie Bros. (Pa.), 27 Atl. 1043; Jones v. Standard Oil Co. (Ark.), 223 S. W. 20; Gillespie's Exrs. v. Howard (Ky.), 294 S. W. 154; Hughes v. Leonard (Pa.), 48 Atl. 862; O'Malley v. New York, N. H. & H. Railroad (Mass.), 96 N. E. 668.] Such holding follows and applies the general rule, "that a master is not, in general, liable for injuries to his servant by reason of defects

in appliances or places for work which are furnished by, and are under the control of, a third person." [39 C. J. 333, and cases there cited.]

In his brief respondent in effect argues that his evidence shows the existence of a local custom in St. Joseph for the owner of grain stored in elevators there in ordering it shipped from the elevator, to inspect the cars into which the grain is to be loaded before same are loaded, or cause them to be inspected, and that in this instance the milling corporation failed to make such inspection or cause it to be made. The testimony tending to show such a local custom consists principally of a statement of plaintiff in answer to the question, "Is there any custom here (St. Joseph) about the inspection of cars to prevent obstructions being in the cars likely to injure employees in unloading?" Answer: "Yes, sir, custom of inspecting cars, the man owning the grain if he orders it loaded, must inspect those cars or cause somebody else to." Plaintiff's testimony appears to be more in the nature of a statement of what in his opinion the owner of grain in ordering same shipped from an elevator ought to do under such circumstances than evidence of the existence of a local custom. The theory that the milling corporation is liable because it violated a duty created by a local custom thereby taking the case from under the operation of the general rule of law hereinbefore stated and which would otherwise apply is presented for the first time in this court. Such custom was not pleaded, the case was not tried on such theory and plaintiff's instructions did not submit that theory to the jury. Plaintiff's testimony as to a local custom does not show how long the alleged custom had existed prior to plaintiff's alleged injury; that it prevailed at the time plaintiff was injured; that either plaintiff or the milling corporation had knowledge of such custom prior to or at that time; that the plaintiff relied thereon or that the milling corporation had prior thereto followed or observed such custom. The petition does not charge a duty on the part of the master arising out of a local custom and its violation to make the master liable. It no where charges that there was a duty resting upon the milling corporation to inspect or cause cars to be inspected at the point of loading and before same were loaded by virtue of an established local custom. In Kirkland v. Bixby, 282 Mo. 462, 222 S. W. 462, this court says: "If the duty arises from a custom, or usage, the custom or usage should be pleaded, and if not pleaded no evidence of a custom is admissible," and "the local usage should be pleaded, if such local usage is relied upon to take the case out of the usual rules of law." The local custom or usage which respondent refers to in his brief as taking this case out of and from under the general rules of law applicable thereto was neither pleaded nor proven.

For the reasons stated appellant's demurrer to the evidence should have been sustained and the jury should have been directed to find for the appellant. Therefore the judgment and order of trial court granting plaintiff a new trial is reversed and the cause is remanded with directions to the court *nisi* to enter judgment for the defendant, Larabee Flour Mills Corporation, on the verdict. *Sturgis* and *Hyde, CC.*, concur.

PER CURIAM :—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All of the judges concur.