Lee Forbis v. J. M. Hessing, Doing Business under Firm and Style of Hessing Construction Company, Appellant.—41 S. W. (2d) 378.

Division One, July 28, 1931.

*Allen, Moser & Marsalek* for appellant.

700

*Jones, Hocker, Sullivan & Angert* and *Ralph T. Finley* for respondent.

RAGLAND, J.—This is a master-and-servant case: an action for personal injuries suffered by an employe through the alleged negligence of his employer. For a general statement of the issues involved and the questions brought up on this appeal, we quote from appellant's brief:

"Lee Forbis, the respondent, instituted this suit against the appellant, J. M. Hessing, to recover damages for personal injuries sustained while in the appellant's employ. The trial below resulted in a verdict in favor of appellant, following which a motion for a new trial filed by respondent was sustained by the court on the ground that the verdict of the jury is contrary to the weight of the evidence. Appellant perfected this appeal from the order of the court sustaining said motion and seeks to have the verdict of the jury reinstated.

"The issues were made up upon respondent's second amended petition and the appellant's answer thereto.

"The amended petition alleges, in substance, that the appellant is a building contractor, engaged in business under the firm name and style of Hessing Construction Company; that on and prior to the 13th day of March, 1926, appellant was engaged in assisting in the construction of the Bell Telephone Building in St. Louis, during which time respondent was in his employ as a lather; that on or about said day the respondent as such employee was engaged in the work of placing metal laths on the walls and columns of said building, and in the course of said work it was necessary for respondent to stand on a scaffold which consisted of four stepladders about twelve feet high, placed around the column on which he was working, with crossboards resting on the steps of said ladders, creating a platform about ten inches wide upon which respondent walked and stood while engaged in his work, and that while so engaged one of said boards

broke, causing the plaintiff to fall a distance of about seven feet to the floor below. Appellant was charged with negligence causing respondent's injuries, as follows:

"(1) That appellant negligently provided a defective, weakened and insufficient plank in said scaffold, in that said plank was weakened by knot holes, auger holes and cracks therein, and that such defective plank was so covered with plaster that respondent, in the exercise of due care, did not discover such defects before standing on it.

"(2) That the appellant, by his foreman, agent and servant in charge of said work, negligently directed the building of such scaffold in a negligent manner and of defective material, in that one of the boards was full of knots and knot holes so that it was weak and likely to break, when he knew, or by due care should have known, of such defects.

"The answer was a general denial. . . .

"The action of the trial court in setting aside a verdict and granting a new trial, on the ground that the verdict is against the weight of the evidence, will be regarded as arbitrary and unwarranted and will not be sustained where the evidence is such that no verdict for the party in whose favor the new trial was granted will be allowed to stand. (Citing cases.)

"The evidence failed to make a submissible case for plaintiff for the reason that the evidence showed that defendant, as a master, could not, by the exercise of ordinary care, have discovered that the condition of the board in question was such as to render it dangerous for use by plaintiff, but that the hidden, latent defect therein was one which, under the circumstances, could not have been discovered except by the exercise of such extraordinary care to make a minute examination or test as is not required of a master. (Citing cases.)"

Appellant's contention just set forth challenges the sufficiency of the evidence to support a jury finding that he failed to exercise ordinary care in providing the scaffold board which broke and thereby occasioned respondent's injuries. The evidence bearing on that specific issue will be abstracted or summarized.

Respondent was employed as a metal lather. At the time of his injury he was standing on a scaffold and was engaged in drilling holes in a column or pilaster which was to be covered with metal laths. In the construction of the scaffold four stepladders were used; they were so placed that two of them supported a single board on one side of the column, and the other two a board on the opposite side; these two boards in turn supported a third placed at right angles to them and next to the column. Each of the boards was approximately two inches thick and ten inches wide and was ten or twelve feet in length; one of them, when respondent was standing on it, suddenly broke in two, dropping him to the concrete floor seven feet below and thereby occasioning the injury for which he sues.

Respondent testified: "I had nothing to do with the construction of this scaffold in the first place; I had nothing to do with the selection of the boards that went into the scaffold; when it was first built I was drilling holes in the bottom of the column and I was standing on the floor. I am not positive as to who moved the scaffold from other positions to the position where it was when I was injured on it. It only takes a few seconds to move a scaffold and I am not sure who did move it. I couldn't say whether I had anything to do with the moving of it or not. It takes such a short time to move one I couldn't say. Mr. Peterson selected the particular board that broke; I did not look at the board after it broke."

Peterson, the foreman, testified: "I was foreman over him; I was acquainted with the scaffold on which he was working; the board which broke was found in the stairway at the landing between the sixth and seventh floors; I found it and brought it to the place where the scaffold was built; boards were scarce around that floor and I had to hunt them; I selected that board myself; it was at least twelve inches, or ten inches wide, and I think the others were about eight inches wide. It was yellow pine; it was the one I selected myself and furnished for the scaffold on which Mr. Forbis was working; I was not present when the accident occurred. I seen the board after it broke. It was a regular break, a 'V' shaped break; there was a knot in it; it broke at a knot. About the size of a dollar. . . . I didn't examine the board before I put it on the scaffold; it was a board that was covered with mortar; it had been used by the brick-layers, I think, along the stairway; the stairs are enclosed; in the stair where I found this board, the entire walls were enclosed; evidently the bricklayers used this board, because it was covered with mortar. It looked all right to me before I put it on the scaffold."

Sperry, a fellow-worker, testified: "I examined the board that broke. It was . . . about 2x10, about eight or ten feet long. . . . it was rough and well used; the edges were rounded; I picked up the board purposely to look at it and it was broken in that (V) shape towards the center. It was broken in two pieces; clear break. There apparently were two knots in the board, the way it looked to me. It looked as though there might have been a limb growing from either side and formed the 'V' shape . . . it looked like it had been used for scaffolding purposes."

Another metal lather, Miller, testified: "I examined the board that broke. I found it broken in a 'V' shape like that (indicating) and the knots that formed from the side, it caused the board to break, no doubt; that is the way I found it. Q. Were those such knots as could be found on a careful inspection of the board? A. Well, now, that is possible; if a man would inspect the board carefully it is possible that it could be detected. Q. The knots were very discernible where

it had broken? A. They were where it was broken. . . . This board had mortar or stuff on it, it had been used more or less by someone, I couldn't state just who, but there was mortar on the board that had been used. I wouldn't say that the board looked like it had been used for scaffold purposes before, because they often lay a board along the wall to catch mortar. It had been used and there was mortar all over it, but whether it had been used for scaffold purposes I wouldn't say.''

Appellant testified: ''For this particular job I ordered brand new planks for scaffold purposes. This lumber was bought from the St. Louis Lumber Company. The papers you show me are copies of the invoices showing that it was bought in the latter part of October, just before the work started in November. The boards are described as $1\frac{1}{4}$x8s, 16 feet long. They are marked 'scaffold boards.' Scaffold boards are sort of a special board that lumber companies furnish for that particular purpose. They take a 12x12 and saw these planks from it, picking out a timber that is absolutely clear and free from knots. It is a specially graded kind of lumber and the best to be had. During the progress of the work, additional boards of the same kind were bought. . . . I don't know what boards were on this particular floor on the day of the accident. The plaintiff was under the direction of Mr. Peterson and Mr. Allton. It was Mr. Peterson's business, among other things, to furnish and supply the scaffold boards for the men to use, and it is the business of the workmen to use the boards that are furnished them.''

I. Appellant's contention that the evidence was insufficient to have supported a finding of negligence on his part rests on his assertion that the defect in the scaffold board was latent or hidden. But no defect can be considered latent which is discoverable by the exercise of due care. [3 Labatt's Mas. & Serv. (2 Ed.) Sec. 1058.] The degree of care required depends on the character of the place, appliance or machine in question, and upon the danger to which the employe is subjected. [18 R. C. L. 562.] It also depends to some extent upon the source from which the appliance was obtained, and the circumstances attending its procurement. If the scaffold board in question had been one of those originally purchased from the St. Louis Lumber Company, assuming it to be a reputable manufacturer, appellant could to some degree have rested upon the assumption that it had exercised due diligence in seeing that the board was fit for the use intended. In that case a somewhat superficial examination of the board by the foreman at the time he selected it for use in constructing the scaffold would no doubt have satisfied the requirements of ordinary care. The board, however, was not one which had been

purchased by appellant to be used in the construction of scaffolds, nor had it ever before been so used by him; it was an old, worn, mortar-covered board which the foreman assumed had been used by bricklayers for some purpose. Under such circumstances it was incumbent upon appellant, acting through his foreman, to have made such a test or examination as would reasonably have disclosed the presence or absence of knots or other defects in the board. "If a master undertakes, or is legally bound, to supply certain instrumentalities to his servant, he must, at his peril, see that they are properly inspected before being brought into use." [4 Labatt's Mas. & Serv. (2 Ed.) Sec. 1512.]

Witness Miller testified that it was possible to have discovered the knot, the defect, by a careful inspection, that is, that the existence of the defect was capable of ascertainment by careful inspection. In this he is fully corroborated by the physical facts which the evidence portrays. The foreman, however, made no examination at all. The board looked all right to him when he put it on the scaffold, and that was the extent of his inspection. That his use of the board, without an adequate inspection, constituted negligence cannot be seriously questioned. [Mulloy v. Painting Co., 214 S. W. 405, and authorities cited.]

II. Appellant makes the further point that "as there was no conflict whatever in the evidence, the trial court was without authority to grant a new trial on the ground that the verdict is against the weight of the evidence."

"The weight of evidence is not a question of mathematics, but depends on its effect in inducing belief." [Braunschweiger v. Waits, 179 Pa. St. 47.] The trial court may have considered that the jury failed to grasp the significance of the facts which the evidence disclosed, or that, owing to a lack of comprehension of the proper standard of legal duty applicable to defendant's conduct, they failed to draw from them the inference that should have been drawn, and that in either event there was a mistake upon the part of the jury which occasioned an improper verdict. And if so, the court had ample authority to grant a new trial under the provisions of Section 1002, Revised Statutes 1929. But regardless of the statute, the court had the inherent power to grant a new trial, if in its opinion the verdict was against the weight of the evidence as a whole, that is, contrary to the effect which should have been accorded the evidence rationally considered. [Duggan v. Fidelity & Casualty Co., 296 S. W. 822, 823.] See also Cullison v. Wells, 317 Mo. 880, 279 S. W. 370.

The order of the circuit court granting a new trial is affirmed and the cause remanded. *Atwood* and *Frank, JJ.,* concur; *Gantt, P. J.,* concurs in the result.