RALPH STOUTIMORE v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, a Corporation, Appellant.—92 S. W. (2d) 658.

Division One, March 10, 1936.

464

*Cyrus Crane, George J. Mersereau, John N. Monteith* and *Dean Wood* for appellant.

*Ira B. McLaughlin* and *John W. Coots, Jr.*, for respondent.

HYDE, C.—This action, for damages for personal injuries, was commenced against defendant railroad and its conductor, Ellis. Plaintiff claimed that the defective condition of a hand brake caused him to fall from the top of a cattle car. Plaintiff had a verdict for $40,000 against defendant railroad, but the jury found in favor of defendant Ellis. The court overruled defendant railroad's motion in arrest and for a new trial, after plaintiff made a *remittitur* of $15,000. Ellis died prior to the ruling on these motions and no attempt was made to revive against his estate, or to appeal from a judgment in his favor. A final judgment was entered for plaintiff for $25,000 against defendant railroad, hereinafter referred to as the defendant.

Defendant's assignments of error present for our determination the following questions: Did plaintiff make a case for the jury? Was the negligence charged against defendant based solely on the negligence of Ellis so that it could only be liable, on theory of *respondeat superior*, because of his conduct? Is the judgment entered after *remittitur* still excessive?

We will consider first defendant's contention that the judgment should be reversed because it is self-destructive. It claims that, since the jury found Ellis to be without negligence, it must also be discharged. It is unquestionably the law, as appellant contends, that if a plaintiff's petition against two defendants states only a case of liability upon the principle of *respondeat superior*, then, if there is a verdict discharging the one defendant for whose negligence *only* it is sought to hold the other defendant, no judgment can be based thereon against either defendant, and if entered must be set aside. [Doremus v. Root, 23 Wash. 710, 63 Pac. 572, 54 L. R. A. 649, and note; for Missouri cases and other authorities see McGinnis v. C., R. I. & P. Railroad Co., 200 Mo. 347, 98 S. W. 590, 9 L. R. A. (N. S.) 880, 118 Am. St. Rep. 661, 9 Ann. Cas. 656, and note; Whiteaker v. C., R. I. & P. Railroad Co., 252 Mo. 438, l. c. 450, 160 S. W. 1009; Brunk v. Hamilton-Brown Shoe Co., 334 Mo. 517, 66 S. W. (2d) 903; Michely v. Mississippi Valley Structural Steel Co., 221 Mo. App. 205, 299 S. W. 830, 54 L. R. A. 649, note; 35 A. L. R. 652, note; 75 A. L. R. 1189, note; 39 C. J. 1367, sec. 1602; 18 R. C. L. 776, sec. 236. See also 15 R. C. L. 1026, sec. 501, and McNamara v. Chapman, 81 N. H. 169, 123 Atl. 229, 31 A. L. R. 188, and note; Stephens v. Oberman Mfg. Co., 334 Mo. 1078, 70 S. W. (2d) 899; Id. (Mo. App.), 79 S.

W. (2d) 516; Stith v. Newberry Co., 336 Mo. 467, 79 S. W. (2d) 447; Wright v. Hannan & Everitt, 336 Mo. 732, 81 S. W. (2d) 303; Ruehling v. Pickwick-Greyhound Lines, 337 Mo. 196, 85 S. W. (2d) 602.] Plaintiff admits that he stated a case against defendant upon the theory of *respondeat superior* for the negligent failure of Ellis to inspect the cars set out by him for which defendant's liability would depend upon proof of his negligence, but plaintiff says that his petition also sufficiently states a case against defendant for violation of its nondelegable duty to furnish him cars with efficient hand brakes in a reasonably safe condition for his use, which is in no way based upon the negligence of Ellis. Plaintiff, therefore, claims that the finding for Ellis and against defendant is not an inconsistent verdict.

This matter must be determined by the allegations of the petition. Those material to this issue are as follows:

"Plaintiff further states that on or about the 21st day of July, 1930, he was lawfully at and near the tracks, switches and yards of the corporate defendant . . . for the purpose of preparing and loading certain cattle for shipment over said road from said City of Wexford, County of Clinton and State of Missouri, to a point in the State of Illinois, pursuant to the terms of the contract of shipment theretofore entered into between plaintiff and said corporate defendant; that for this purpose defendants set upon said tracks certain cars for plaintiff's use; that, as was their custom, defendants placed said cars upon the sidetracks in said yards, with the brakes thereon set; that, as a part of said contract of shipment plaintiff was required to prepare said cattle for shipment and load the same into the cars thus furnished to him by the defendants, and, in so doing, it became necessary for him to be on and near the tracks in and about said yards, to be and ride in and upon said cars and to move the same over and upon the tracks at the switch yards aforesaid; that, in order to move the cars from one place to another in said yard as aforesaid, it became necessary for plaintiff to use and operate the brakes and brake appliances on said cars, all of which was well known to the defendants, or by the exercise of ordinary care could have been well known to the defendants, their *agents, servants and employees*, at all of the times herein mentioned; that it was the duty of the defendants to furnish to plaintiff and set upon said tracks for plaintiff's use in loading said cattle, cars which were properly constructed, in good repair and which were equipped with efficient brakes and brake appliances, with said brakes and brake appliances properly set thereon, and to make a reasonable inspection of all cars so placed upon said tracks for plaintiff's use before permitting the same to be used on said line of railway to see that the same were in a reasonably safe condition and adapted to the purpose for which they were intended to be used.

"Plaintiff further states that on said 21st day of July, 1930, *by reason of the carelessness and negligence of the defendants, their agents, servants and employees, the brakes and brake appliances on one of the cars so placed upon said tracks for plaintiff's use as aforesaid,* in preparing and loading said cattle for shipment, *were defective,* out of repair and inefficient, by reason of which said brakes and brake appliances could not be properly controlled or worked in the usual and ordinary manner. . . . (Here the details of the construction and operation of the brakes and the manner in which plaintiff was injured are stated.)

"Plaintiff further states that the defendants were negligent in furnishing to plaintiff, and in using and permitting to be used, and in moving and permitting to be moved upon its said line of railway, the said car which was not equipped with efficient hand brakes, in that said brakes and the brake appliances connected therewith were old, worn, loose, dilapidated, out of repair and defective so that said brakes and brake appliances failed, at said time and place, to work in the usual and ordinary manner. . . . Plaintiff further states that the negligence of the defendants concurred and cooperated jointly to directly and proximately cause plaintiff's injuries."

Defendant says that it "does not contend that plaintiff could not have sued this defendant on its non-delegable duty, but does contend that plaintiff on the face of the petition plainly did not do so." We think defendant is wrong about this. Clearly this petition does not allege "a case where nobody could be or was negligent" with respect to this car except Ellis, and "a finding that he was not negligent did not negative all possible negligence of the other servants" of defendant. [See Stith v. Newberry, 336 Mo. 467, 79 S. W. (2d) 447.] The facts stated show that there must have been negligence of other "agents, servants, and employees" of defendant which combined with his negligence to result in a car with defective brakes being furnished to plaintiff by defendant, because, of course, Ellis did not select the cars to be sent to Wexford. If he was negligent in failing to comply with a rule requiring him to inspect the car, from which plaintiff fell, before setting it out for his use, he might also be liable if his negligence was a direct concurring cause of plaintiff's injuries. However, Ellis had a right to defend on the ground (and the jury to believe) that he was not the conductor who set out the car from which plaintiff fell. Whether he was negligent or not, if the negligence of other "agents, servants, and employees" of defendant, was a direct cause of a car with defective and unsafe brakes was furnished for plaintiff to so use and operate, would not defendant be liable for his injuries caused thereby?

■ Plaintiff was on appellant's premises for its benefit and, under any test, was an invitee. [Gilliland v. Bondurant, 332 Mo. 881, 59 S. W. (2d) 679; Savage v. C., R. I. & P. Railroad Co., 328 Mo. 44, 40 S. W. (2d) 628.] He was not only on the car as an invitee but was there by agreement with defendant to do for it what would properly have been work for its employees. Certainly, if plaintiff was required by his contract to move and load the cars for defendant for its convenience so that they would be ready to go when the train came, defendant's duty to plaintiff, to furnish safe appliances with which to do this work for it, was at least that of any employer to his employees (leaving out of consideration the Federal Safety Appliance Act), namely: To use ordinary care to see that safe and suitable appliances are provided. This is a nondelegable duty of the employer, not of any particular employee, which "often concerns matters beyond the control of individual employees." [Kelso v. Ross Construction Co., 337 Mo. 202, 85 S. W. (2d) 527, and authorities cited.] Defendant certainly owed plaintiff the duty "to supply cars which were reasonably safe, fit, and suitable for the purpose for which they were intended to be used." [Allen v. Larabee Flour Mills, 328 Mo. 226, 40 S. W. (2d) 597; Applegate v. Q., O. & K. C. Railroad Co., 252 Mo. 173, 158 S. W. 376; Sykes v. St. L. & S. F. Railroad Co., 178 Mo. 693, 77 S. W. 723; Roddy v. Missouri Pacific Railroad Co., 104 Mo. 234, 15 S. W. 1112.]

Necessarily, the negligent omission of Ellis would only be the last of a series of similar negligent omissions of other employees, which combined to result in the furnishing of the car with defective and unsafe brakes for plaintiff to use, and "unless the liability of the master is based solely on the negligence of the particular servant who is sued and acquitted, that is if the master is guilty of negligence distinct from the negligence or tort of the servant, though combining with it, or the injury is due in whole or in part to the negligence of other servants than the one sued, then an acquittal of the servant sued does not nullify the verdict and judgment may go against the master." [Stith v. Newberry Co., 336 Mo. 467, 79 S. W. (2d) 447.] We hold that plaintiff's allegations, while sufficient perhaps to state a case against Ellis for negligent failure to inspect as required by defendant's rules and to discover the defective condition of the brake before he set the car out for respondent's use, nevertheless also state facts showing a duty of defendant to plaintiff, and the negligent violation thereof, based upon acts of other employees than Ellis, and which depended upon matters over which he had no control.

■ If defendant had attacked this petition by a proper motion, it might have forced plaintiff to state in separate counts a cause of action based upon its negligent failure to perform its nondelegable

duty, and a cause of action based upon its conductor's negligent violation of its rules requiring a final inspection before the car was set out to be used. Defendant, however, made no objection to the petition and, after verdict, we must uphold judgment upon the theory of failure to perform a nondelegable duty unless the petition wholly fails to state such a cause of action. [Brock v. Mobile & Ohio Railroad Co., 330 Mo. 918, 51 S. W. (2d) 100, and cases cited.] We note also that defendant's Instruction 3 stated: "If you find and believe from the evidence that his (plaintiff's) injuries were occasioned without negligence on the part of the defendants, or either of them, then plaintiff cannot recover against such defendant, or defendants, if any, whom you may find to be without negligence." This would seem to recognize that the petition might be construed as we have construed it. We, therefore, hold that under the petition herein the verdict was not self-destructive. This also necessarily rules defendant's further contention that, in submitting negligence of "agents, servants, and employees" other than Ellis in the performance of appellant's nondelegable duty, the instructions were broader than the pleadings.

Defendant next contends that its demurrer to the evidence at the close of the case should have been given because there was no evidence to show the existence of the defect in the brake which plaintiff claimed caused his injury, or, if it did exist, that it existed long enough prior to the accident that it could have been discovered by a reasonably careful inspection; and also because respondent was guilty of contributory negligence as a matter of law. Considering the evidence from the view most favorable to plaintiff's contentions, as we must in ruling this question, we find that there was evidence which tended to show the facts hereinafter stated.

Wexford was a blind station on the Santa Fe with no station agent in charge, located five miles east of Plattsburg. There was a single sidetrack to the north of the main line, which ran east and west. This sidetrack connected with the main line at both its ends. There was a stock pen, shelter and loading chute on the sidetrack. This sidetrack had a slight downgrade to the west. On Friday, July 18, 1930, plaintiff ordered four freight cars to be placed at Wexford for shipment of his cattle. This order was given to the Santa Fe station agent at Plattsburg. Plaintiff, with two colored helpers, Clark and Hawkins, brought his cattle to Wexford about three-thirty Monday afternoon and found several freight cars placed on the sidetrack in a row east of the loading chute. Hawkins said there were six cars. The door of the closest car was about two or three feet from the chute. They drove the cattle into the pens, bedded the four cars to be loaded, and then went to Plattsburg, where plaintiff lived when he was not on his farm about eight miles from town. At the railroad station

there, he signed his shipping contract which required him to load the cattle into the cars at Wexford. Plaintiff and his colored boys returned to Wexford at about six-thirty or seven P. M. and began to load the cattle. Plaintiff released the hand brake on the first car nearest the chute and, with a pinch bar and car mover, they pinched (moved) that car two or three feet to the west until the door was even with the chute. When they loaded this car, plaintiff climbed upon it and the colored boys barred it (pinched it with these tools) to give it a start downgrade (west). Plaintiff rode this car until it was a sufficient distance west of the chute to permit the other cars to be loaded, and then stopped it with the hand brake. The second car was moved to the chute, loaded and moved to the west, in the same way. They then went to the third car, but were unable to release the hand brake. Each of them went on top of this car and made an effort to release this brake. Failing to do so, they were then able to bar this empty car (downgrade) with the brake set. The wheels on which they worked would turn, but they could only move it an inch or two at a time. They succeeded in pinching it two and one-half car lengths, about 100 feet, down to the chute with the brake set, after about an hour's work. They endeavored to pinch it on west, after it was loaded, but were then unable to move it. Plaintiff again went on top of this car and made another unsuccessful effort to release the brake.

When plaintiff was on the car this second time he had an electric lantern and he examined the brake. This hand brake was operated by a horizontal wheel on top of the car on the upper end of the brake staff which extended down through the car. Below the bottom of the car, a chain connected the staff with the brake rods. This chain would wind around the staff when the wheel on top of the car was turned, and would pull the brake shoes against the car wheels. There was a ratchet on the brake shaft, on the top of the car, with a dog or pawl, attached at one end on a bolt through the top of the car, which would stop the wheel from turning by catching in the teeth or notches of the ratchet. Plaintiff said that, when he looked at the brake, the end of the pawl in the ratchet wheel was up above the top of the ratchet; that the same was holding "maybe one-half the thickness of it. . . . maybe not that much;" that the top of the pawl came above the top of the ratchet just "a little bit;" and that there was a space of from one-fourth to one-half inch between the top of the other end of the pawl attached to the bolt and the bottom of the nut on the pawl bolt.

Plaintiff thought that by pinching the car "back a little bit" (east) they could take some of the pressure off the brake. They did succeed in pinching it "very little bit . . . maybe an inch." Plaintiff then went on this car a third time, again taking his lantern with him.

He said that "it was then 9 o'clock;" that the train was hardly ever on time; but that it was due between eight-thirty and nine o'clock. Upon this occasion, he again tried to turn the brake wheel to release the brake, and he succeeded "finally" in turning it enough to the right (clockwise) to push the pawl out of the ratchet with his toe. Then he turned the wheel back to the left (counter-clockwise) "not over a couple of notches" and kicked the pawl back into a notch of the ratchet with his toe. Plaintiff said: "I released some of my pressure, but I still had a grip on the wheel, and this dog (pawl) slipped right over the top of this ratchet, and when the dog slipped over the top of the ratchet, that threw me off." He said that for only an instant he saw the pawl over the top of the ratchet. He testified he did not know why it slipped out; that his lantern light was full on the pawl and ratchet; and that he could see it plainly. He said that the wheel reversed to the left, or counter-clockwise, and that this threw him off the car. When he fell he struck the north rail of the track and was seriously injured. Clark was sent for a doctor, and Hawkins got plaintiff off the tracks, onto a grassy spot. Hawkins said that when he ran to pick him up, plaintiff said, "loose now, that dog, that dog." Hawkins said "what caused all this?" and plaintiff answered, "Oh, that dog." Hawkins went up on top of the car to get the lantern. He then examined the brake appliances for the first time and found that the brake staff was loose; that the pawl was loose; that the nut above the pawl was tight; that both the nut and the pawl bolt were rusty; and that the lower corners of the pawl were worn and rounded off, half way up the back. Hawkins further testified that he was watching respondent tugging and pulling at the brake wheel and saw him fall off the car; and that when he went up and examined the brake wheel he did not find the dog above the ratchet, but said that the dog was back in it. Clark was behind the car and did not see plaintiff fall.

There was considerable contention and conflict of testimony at the trial as to the identity of the car from which plaintiff fell. There were more than four cattle cars on the siding at Wexford when plaintiff arrived with his cattle. While plaintiff's helpers bedded four of these cars, he wrote the car numbers on a match box. When he went to Plattsburg, he gave these numbers to the station agent who made out his shipping contract and the way bills for each car. The car numbers written on them by this agent were 60477, *57249*, 56633 and 59452. These last three numbers were later changed to 58755, 56424 and 52828 (changed again to 57828). Ellis said that when he put the loaded cars into the train at Wexford he took these numbers from them, and that when he compared them with the way bills he found that three of the waybill numbers were wrong. He corrected

his waybills and sent a correction memorandum back to Plattsburg from which the agent corrected the shipping contract. Ellis said that he had set six stock cars out at Wexford on July 19 which his train record showed were 58755, 56424, 57828, *59249*, 56633 and 59452. It was not shown when or by whom car 60477 was set out at Wexford. Ellis was in charge of the train every other night and another crew operated it between his runs. Ellis said that there were two empty cars left at Wexford when he took out the four loaded cars. There was other testimony to the effect that there were more than six cars on the side track. Ellis said that car 56424 was at the chute (he said once 60477 but later corrected this statement) when he arrived at Wexford and found respondent injured. Plaintiff said that he did not know the number of the car from which he fell. Plaintiff's evidence, however, tended to prove that the cattle car from which he fell appeared to be an old car; that the paint thereon did not appear to be fresh; that the car had two doors on each side; that the tracks on which the wheels of the doors ran were rusty; that these tracks were sprung so that it was necessary to use a crow bar to open and close the doors; and that the sill of the door appeared to be old. Defendant's evidence tended to prove that the stock car in question was No. 56424; that it was a "comparatively new," "reconstructed" and "reconditioned car;" that in April preceding plaintiff's fall in July, this car had been overhauled and freshly painted; that car No. 56424 had only one full length door on each side; that car No. 56424, was in the Santa Fe repair shop at Topeka from April 23 to May 1, 1930, two or three months before the accident; that the brake shaft was taken off and replaced, and a new roof put on; and that the car was thoroughly inspected before being sent out on the road. Defendant also introduced evidence showing that on July 19, 1930, car No. 56424, was inspected by the terminal inspectors at St. Joseph, Missouri, and that no defect was found in the hand brake. Terminal inspectors testified that it was their duty to examine the brake and pawl; that they would examine and step on the pawl to see whether it was loose; and that they made such inspection of this car at St. Joseph on July 19, 1930. The inspection report shows that the routine inspection was made at St. Joseph; that no defect was found in the hand brakes in the train of cars which included car 56424; and that the train, inspected at St. Joseph on July 19th, left this car and five others at Wexford. Defendant also had evidence of tests made with this car, and others, to show that it could not be moved with bars when the hand brake was set tight and to show that, if the dog was suddenly disengaged from the ratchet, it would only turn back three notches.

Although the jury may have believed defendant's evidence that the brakes on car 56424 were in good condition, still we think that there

was a jury question as to whether or not it was the car from which plaintiff did fall. If plaintiff did not fall from it, then there is no evidence except his own testimony and that of Hawkins as to the condition of the brake on the car from which he did fall, and it would be substantial evidence to show that one of the cars furnished by defendant did not have a hand brake in a reasonably safe condition for plaintiff to use for the purpose he was required to use it. Even so, defendant says that plaintiff's evidence showed it was impossible for the defects claimed to have existed and impossible for the accident to have happened in the way he said it did. Defendant says that if the dog stayed in the ratchet with the pressure of the tightly set brake on it, while three men, as they said they did time after time, pulled on the brake wheel with their utmost strength and tried to kick it loose, then this was "an absolute demonstration that there was no looseness or defect of any kind which could cause it to jump or slip over the ratchet. Defendant also says it is "inconsistent with natural law" that, after the brake was loosened two notches, "the brake suddenly whirled with sufficient force to throw him off the car." Plaintiff testified positively that when he attempted to reset the dog in the ratchet it did slip up, out of, and over the top of the ratchet and that there was a back spin of the brake wheel which threw him off the car. He had evidence that the bottom or lower corners of the dog were worn and rounded off half way up; that part of the end of the dog which went into the ratchet was higher than the top of the ratchet when the brake was set; that the nut which held the dog was high enough on the bolt to leave room for the attached end to move up or down on the bolt; and that the brake staff to which the ratchet was attached was also loose. Under these circumstances we do not think that we can say that it was demonstrated absolutely that these defects did not exist; or that it was impossible, because the dog stayed in the ratchet under pressure of the tightly set brake, for it to have slipped over the top of the ratchet when being reset in another notch; or that it was impossible to have resulted in enough back spin of the brake wheel to cause respondent to fall off of the car if it did slip over the ratchet. There were pictures, models, and demonstrations before the jury and they saw and heard the witnesses. We think that this matter of the possibility of these occurrences is, at least, a question concerning which reasonable minds could fairly and honestly differ, and that it was, therefore, a jury question. [Hardin v. Illinois Central Railroad Co., 334 Mo. 1169, 70 S. W. (2d) 1075; Parrent v. Mobile & Ohio Railroad Co., 334 Mo. 1202, 70 S. W. (2d) 1068; Gately v. St. Louis-San Francisco Railroad Co., 332 Mo. 1, 56 S. W. (2d) 54; Doyle v. St. L. M. B. T. Railroad Co., 326 Mo. 425, 31 S. W. (2d) 1010.]

█ In ruling defendant's contention that the evidence fails to show either actual knowledge of the worn condition of the dog, the space for play on the bolt where it was attached, and the looseness of the hand brake staff, or that these defects were discoverable on ordinary inspection long enough prior to the accident to put defendant on constructive notice, we get back to the question of whether plaintiff stated a case based upon defendant's nondelegable duty to furnish safe appliances and instrumentalities, which we have already decided against defendant. Defendant's contention, therefore, overlooks the fact that these defects were in the instrumentalities, which it furnished to plaintiff for the purpose of having him use them, as he did, to do something for defendant's benefit, and that they were in a defective condition for such use, at the time they were furnished, if plaintiff's evidence is true. Under these circumstances, holding defendant to no greater duty than an employer's duty to its own employees when it undertakes to furnish instrumentalities for their use, defendant "must, at (its) peril, see that they are properly inspected before being brought into use," and furnishing them for such use "without an adequate inspection constituted negligence." [Forbis v. Hessing, 328 Mo. 699, 41 S. W. (2d) 378; Milburn v. C., M., St. P. & P. Railroad Co., 331 Mo. 1171, 56 S. W. (2d) 80; Gray v. Doe Run Lead Co., 331 Mo. 481, 53 S. W. (2d) 877; Rose v. Missouri District Telegraph Co., 328 Mo. 1009, 43 S. W. (2d) 262, 81 A. L. R. 400; Scheurer v. Banner Rubber Co., 227 Mo. 347, 126 S. W. 1037, 21 Ann. Cas. 1110, and note; 39 C. J. 415, sec. 534; 18 R. C. L. 561, sec. 73.] A case like Thompson v. St. Louis Southwestern Railroad Co. (Mo.), 183 S. W. 631 (Id., 243 Mo. 336, 148 S. W. 484), cited by defendant, is not in point because it was not a case where defective instrumentalities were furnished for use.

As said in the Scheurer case: "The master is not only bound to make a reasonably careful inspection of the premises, tools and appliances which he provides for the use of his servants, when they come into his hands, but he is also bound to repeat such inspections from time to time as often as may be reasonably necessary, having regard to the exigencies and risks of his business, to the end that they shall not be used by his servants after they get out of repair in such a sense as to be dangerous."

While an employer is not liable for failure to discover latent defects when reasonable care has been used in inspection of instrumentalities furnished (39 C. J. 424, sec. 541; 18 R. C. L. 563, sec. 73), nevertheless "no defect can be considered latent which is discoverable by the exercise of due care." [Forbis v. Hessing, supra.] The defects in the dog, ratchet, and brake staff which plaintiff's evidence tended to show existed were not defects which could suddenly occur. For iron to wear away even where working against iron, con-

siderable time must elapse. It also takes more than a few days time for such appliances held by nuts and bolts to become loose. We hold that, at least, there were jury issues as to whether these conditions were as stated by plaintiff and Hawkins; whether, if they were, they could have been discovered by the exercise of ordinary care in inspection before they were sent out from defendant's terminal; and whether the car from which plaintiff fell was the car inspected by defendant's witness. It, therefore, becomes unnecessary to discuss the applicability of the Federal Safety Appliance Act to this case.

■ Neither can we sustain defendant's contention that plaintiff was guilty of contributory negligence as a matter of law. Plaintiff was not an experienced railroad man. He was working in the dark with the instrumentalities furnished to him by defendant. Under such circumstances, he could only be held guilty of contributory negligence as a matter of law if the danger of doing so is so obvious and glaring that no reasonably prudent person in the exercise of ordinary care would undertake to do so. [Jablonowski v. Modern Cap Co., 312 Mo. 173, 279 Mo. 89; Mueller v. Ralston-Purina Co. (Mo. App.), 254 S. W. 720; Van Bibber v. Swift & Co., 286 Mo. 317, 228 S. W. 69; Ingram v. Prairie Block Coal Co., 319 Mo. 644, 5 S. W. (2d) 413; Messing v. Judge & Dolph Drug Co., 322 Mo. 901, 18 S. W. (2d) 408; Sloan v. Polar Wave Ice & Fuel Co., 323 Mo. 363, 19 S. W. (2d) 476; Gray v. Doe Run Lead Co., 331 Mo. 481, 53 S. W. (2d) 877; Rose v. Missouri Dist. Tel. Co., 328 Mo. 1009, 43 S. W. (2d) 562.] We, therefore, hold that contributory negligence of plaintiff was a jury question and that the court did not err in overruling defendant's demurrer to the evidence.

■ There remains the question of the amount of the verdict. This was reduced from $40,000 to $25,000 by *remittitur* ordered by the trial court. Plaintiff's evidence tended to show injuries, as follows:

There was a complete, oblique, comminuted fracture of the upper end of the thigh bone of the left leg, with pieces of the bone broken off. The ball-like portion that fits into the hip socket was broken off where it joined onto the thigh bone. The lower part of the bone turned outward in the process of healing. The result was that all of the bones of the left leg rotated outward, so that plaintiff carried his left foot at right angles with the other foot and seems to drag it. He cannot swing his leg straight and swings his foot outward when he walks. He cannot lift his leg over an object and walking throws a strain on his pelvis. The strain on the muscles causes pain because he is walking abnormally. The injury restricts the normal use of his leg between twenty-five per cent and thirty per cent. This is permanent without chance of improving. It hurts his hip to walk across plowed ground. He can only go up and down stairs by first placing one foot on each step, and then bringing the other up to the

same step. He does not have good balance on his hip and has to walk "with the whole side of his body instead of his leg."

There was a complete fracture of the olecranon process of the ulna of the left arm with multiple pieces broken off. This is the hook shaped bone that adds to the strength of the arm. There is a separation of from an eighth to a quarter of an inch, which is right in the joint of the elbow. The bone protruded through the flesh and some stitches were made to close the wound. This bone is lengthened and plaintiff is unable to fully extend his arm, because it left the bone wedged in the elbow joint, like a wedge in a door. His arm is stiff and he has little strength in it. There is a limitation of motion in extension of between fifteen per cent and twenty per cent. This condition is permanent, with no chance of improvement, and plaintiff is left handed. There was also a linear fracture across the upper end of the radius of the right arm, extending down into the head of the bone, but it was not a complete break and there was no displacement. This arm is a little stiff in the joint, and plaintiff is impeded to some extent in straightening it out. The muscles, tendons, and ligaments of plaintiff's back were injured. Pain was so severe that X-ray pictures were taken of the back, but they did not reveal any broken bones. Plaintiff said that his back still hurt him if he walked very far.

Plaintiff was twenty-eight years of age at the time of the accident. He had good health and was able to do farm work. His occupation was farmer and stockman. He was unmarried, without dependents, and there was no showing as to his earning capacity or loss of earnings. Plaintiff was in the hospital for almost two months and his injuries, as well as the treatment and healing process caused him great pain. His hospital and medical expenses were $750. After he returned home from the hospital, he remained in bed about a week. For two or three weeks he used a wheel chair, but required assistance in getting in and out of it. For eight or nine months after he returned home he required assistance in dressing. After he was able to get out of the wheel chair, he walked on crutches for eight or nine months, and has been required to use a cane ever since. He wore a specially made brace continuously for over a year and a half, both day and night and still wears the same at times. He has been unable to do farm work and has rented his land. He has been able to use a lawnmower, drive an automobile, and walk about the streets to some extent.

It is only possible in fixing compensation for personal injuries to make estimates within limits which seem to be reasonable. If, in a case in which there appears to have been a fair trial without error, the amount awarded clearly seems unreasonable, it is our rule to correct it by ordering *remittitur* of the amount in excess of the maximum which can be sustained in view of all the circumstances and former

precedents. [Clark v. Atchison & Eastern Bridge Co., 333 Mo. 721, 62 S. W. (2d) 1079.] We are usually reluctant to order a further reduction after the trial court has considered and passed upon the matter and once reduced the amount. [Schroeder v. Wells (Mo.), 298 S. W. 806.] However, in this case, the matter was not passed upon by the judge who presided at the trial so that it was necessary there as here to determine the matter from a cold record. The injuries in this case were somewhat similar to those in Frese v. Wells (Mo.), 40 S. W. (2d) 652, and Rouchene v. Gamble Construction Co., 338 Mo. 123, 89 S. W. (2d) 58, in which larger verdicts were reduced to $22,500. The leg injury here may have been about the same in disabling effect as in those cases, but it is doubtful if that is true of the arm injury, and there were also head and shoulder injuries in those cases more severe than plaintiff here sustained. In those cases, there were also permanent displacements in the pelvic region, apparently greater than seems likely to result here. While plaintiff here is a younger man than the plaintiffs in those cases, there is no showing of an unusual hospital record as in the Frese case, or of an exceptional loss of earnings as in the Rouchene case. In view of these cases and also our decisions in cases of complete loss of limbs (see Jenkins v. Missouri State Life Ins. Co., 334 Mo. 941, 69 S. W. (2d) 666, and cases cited), we think this verdict is excessive even after the *remittitur* made. Other cases which tend to throw some light on the matter, although the injuries are not so nearly the same, are the following: Gately v. St. Louis-San Francisco Railroad Co., 332 Mo. 1, 56 S. W. (2d) 54; Wack v. Schoenberg Mfg. Co., 331 Mo. 197, 53 S. W. (2d) 28; Martin v. St. Louis-San Francisco Railroad Co., 329 Mo. 729, 46 S. W. (2d) 149; Potashnick v. Pearline, 43 S. W. (2d) 790; Whittington v. Westport Hotel Operating Co., 326 Mo. 1117, 33 S. W. (2d) 963; Smith v. Acme Boiler & Tank Co., 326 Mo. 734, 32 S. W. (2d) 576; Margulis v. National Enameling & Stamping Co., 324 Mo. 420, 23 S. W. (2d) 1049; Schroeder v. Wells (Mo.), 298 S. W. 806. The greatest amount which we can uphold in this case, in view of the nature and extent of plaintiff's injuries and former precedents, is $20,000.

If plaintiff will within ten days enter a *remittitur* of $5000 as of the date of the judgment, this judgment will be affirmed for $20,000; otherwise, the judgment will be reversed and the cause remanded.

*Ferguson* and *Bradley*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by HYDE, C., is adopted as the opinion of the court. All the judges concur.